**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

CIVIL ACTION NO. 17-84-DLB-CJS

MICHELLE KINDOLL                                                                    PLAINTIFF

v.                          **MEMORANDUM OPINION AND ORDER**

SOUTHERN HEALTH PARTNERS, et al.                              DEFENDANTS

* * * * * * * * * * * * * *

On May 5, 2016, Plaintiff Michelle Kindoll was arrested for possession of heroin and transported to the Grant County Detention Center ("GCDC"). During her time at the GCDC, Plaintiff suffered a stroke, which she alleges resulted in permanent speech and mobility impairments.

On May 12, 2017, Plaintiff filed suit against two groups of Defendants: (1) the "County Defendants," comprised of Grant County, and (in both their individual and official capacities) Corporal Audra Napier, Deputy Tammy Bullock, Jailer Christopher Hankins, and John and Jane Doe; and (2) the "SHP Defendants," comprised of former GCDC medical services contractor Southern Health Partners, Inc. (SHP), and its employees, nurses David Watkins, RN, Debbie Preston, LPN, and David Ross, LPN.[1] (Doc. # 1). Plaintiff's Complaint sets forth four counts—one constitutional claim and three state-law claims. Count One asserts a claim against all Defendants pursuant to 42 U.S.C. § 1983. Count Two asserts a medical malpractice action against Defendants Preston, Ross, and

---

[1]      Plaintiff also filed suit against GCDC employees Dedi Adams, Jessica Helton, and Whitney Jett; however, these Defendants were dismissed by agreement of the parties on August 7, 2018. (Doc. # 75).

Watkins under Kentucky law. Count Three asserts a negligence claim against SHP under Kentucky law. Finally, Count Four asserts a negligence claim against Defendants Napier, Bullock, and John and Jane Doe under Kentucky law.

There are currently two Motions for Summary Judgment before the Court (Docs. # 62 and 83), wherein both groups of Defendants seek summary judgment on all claims. The SHP Defendants have also filed a Motion to Strike (Doc. # 79), which the Court will take up along with these dispositive motions. All three motions are fully briefed and ripe for review. (Docs. # 73, 77, 78, 79, 80, 86, 92, 98 and 99). For the reasons set forth below, the County Defendants' Motion for Summary Judgment (Doc. # 62) is **denied in part** and **granted in part**; the SHP Defendants' Motion to Strike (Doc. # 79) is **denied**; and the SHP Defendants' Motion for Summary Judgment (Doc. # 83) is **denied in part** and **granted in part**.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

On May 5, 2016, Plaintiff Michelle Kindoll was arrested for possession of heroin. (Doc. # 73-6 at 20-21). Plaintiff's adult daughter, Felicia, was arrested as well, and the two women were ultimately transported to the GCDC for pretrial detention. (Docs. # 73-9 at 8, 24, 36-37, 121 and 73-6 at 10-14). During the GCDC intake process, Kindoll advised the staff that she would be experiencing withdrawal from heroin. (Docs. # 73-9 at 162 and 73-7 at 24-25).

Plaintiff was then placed alone in an isolation cell to undergo withdrawal. (Docs. # 73-9 at 37-38 and 73-7 at 25). At the GCDC, isolation cells were used primarily for punishment purposes. (Docs. # 73-5 at 36 and 73-7 at 63). However, as the female "x-block" at the GCDC did not have medical-watch cells, jailers used these isolation cells at

times for "medical watch" purposes such as keeping a closer eye on inmates undergoing drug withdrawal. *Id.* Inmates placed in isolation cells for medical watch were monitored more frequently; the jailer on shift was required to look in every ten to fifteen minutes. (Docs. # 73-5 at 49-50; 73-11 at 33 and 73-12 at 50-51). Likewise, medical staff checked vitals and conducted a basic overview once per twelve-hour shift for inmates on medical watch. (Docs. # 73-2 at 30-32 and 73-3 at 102).

On May 9, 2016, Plaintiff's daughter was released on bond. (Doc. # 73-6 at 20-22). That same day, Plaintiff inquired when she would be moved out of the isolation cell into a general-population cell, as she was no longer experiencing withdrawal symptoms. (Doc. # 73-9 at 41, 146). Approximately two days later, on May 11, 2016, Plaintiff was cleared by medical staff to move to a general-population cell. (Docs. # 73-5 at 61 and 73-9 at 41-43).

It appears that Plaintiff did not display any stroke symptoms while she was interned in the isolation cell for heroin withdrawal. (Doc. # 73-3 at 29). However, on approximately May 18, 2016, about two weeks after being detained at the GCDC, Plaintiff began experiencing stroke symptoms. (Docs. # 73-9 at 46 and 73-22 at 2). While housed in the general-population cell, Plaintiff felt weak and experienced obstructed vision; further, Plaintiff passed out in the shower, requiring other inmates to help Plaintiff back to her "boat"—a mat on the floor. (Docs. # 73-9 at 47 and 73-16). Plaintiff, however, did not seek medical treatment after passing out in the shower. She testified that she did not want to be "put . . . back in isolation." (Doc. # 73-9 at 48-49). Further, Plaintiff testified that she experienced difficulty thinking clearly and did not understand that she was

experiencing stroke symptoms; rather, she believed she had a "pinched nerve" or was "just . . . withdrawing." *Id.* at 48-49, 55-56, 61, 153.

As time progressed, however, GCDC staff and the medical team were alerted to Kindoll's symptoms. That same day on May 18, 2016, at approximately 6:15 p.m., after Plaintiff was moved to the general-population cell, she informed the day-shift deputy jailer, Dedi Adams, that she could not feel her leg. (Doc. # 73-5 at 26, 63). Deputy Adams notified Debbie Preston, LPN, in the medical unit that Plaintiff reported that she could not feel her leg. (Doc. # 73-18). Adams's Incident Report notes that LPN Preston said, "OK." *Id.* However, LPN Preston did not assess Plaintiff at that time. (Docs. # 73-4 at 29-33; 73-5 at 63-64, 68, 72-73, 77 and 73-18).

At the end of her shift, Deputy Adams communicated to the night-shift deputy jailer, Tammy Bullock, that Plaintiff said she could not feel her leg and to keep an eye on her. (Docs. # 73-5 at 64 and 73-11 at 20-21). Deputy Bullock's overnight shift lasted from 6:45 p.m. on May 18, 2016, to 7:15 a.m. on May 19, 2016. (Doc. # 73-11 at 15-18, 21, 25). During her shift, Bullock was alerted by other inmates that Plaintiff complained of "not full body movement." *Id.* Bullock observed that Plaintiff was dragging her right leg and that Plaintiff complained of not being able to use or move her leg and having trouble seeing. (Docs. # 73-9 at 163; 73-11 at 19-21, 27-32, 36-38 and 73-16). Deputy Bullock also noted that the symptoms were irregular; at times during the night of May 18, 2016, the symptoms moved to Plaintiff's left leg; at other times, both legs were normal. *Id.* Additionally, Bullock observed that other inmates in the general-population cell were helping Plaintiff stand up, sit down, and walk to the bathroom. (Docs. # 73-11 at 21 and 73-16). Deputy Bullock notified medical staff and informed the on-duty nurse, David Ross, LPN, that Plaintiff had

been limping and complained that she could not feel her foot.  (Docs. # 73-2 at 76-77, 126-128, 152-153 and 73-11 at 15-17, 25).

LPN Ross conducted an evaluation of Plaintiff and found her vital signs to be normal.  Ross performed and improperly interpreted a "Babinski test" to look for neurological issues.  Ross misinterpreted a positive indication as a negative, and failed to recognize a sign of any other health conditions.  (Docs. # 73-2 at 68-77; 73-9 at 63; 73-16 and 73-10 at 52-54, 80-81, 83).  Noting that Plaintiff had indicated on her intake form that she had back problems, Ross concluded that the numbness in Plaintiff's leg was merely sciatica and he chose not to reach out to his supervisor, Medical Team Administrator David Watkins, RN, or to the on-call physician.  (Doc. # 73-2 at 72, 79, 86-87).

LPN Ross testified that inmates who had more acute needs at the GCDC were not treated significantly different than patients who were on long-term medications or received chronic care.  If he perceived that an inmate had a serious medical condition, Ross testified that he would not reach out to a physician immediately but would "[s]tart out by calling [Medical Team Administrator, Nurse David Watkins], asking him what he thinks. And then he would typically say, go ahead and call a doctor, or, I'll observe."  *Id.* at 48-50.  On the day he assessed Plaintiff, Ross did not reach out to the Medical Team Administrator, David Watkins, nor did he contact the physician on call; rather, he put a note in the binder for the physician to review when he made his periodic visit the following week.[2]  (Docs. # 73-2 at 72, 78-79 and 73-3 at 14).

---

[2]	The treating physician, Dr. Amos, was only scheduled to visit once per month, and Certified Nurse Practitioner Roy Washington was scheduled to show up at the GCDC only once per week.  Absent a call from the nurses, neither Dr. Elton Amos nor NP Roy Washington would be alerted to a patient's issues until

Shawnee Thoman, the regional representative for SHP—the corporation contracted by Grant County to ensure treatment guidelines were being adhered to—testified that it was the role of the physician to decide a patient's care. (Doc. # 73-10 at 12, 38-39). However, Thoman testified that she was not aware of the physician contracted to provide services at GCDC, Dr. Elton Amos, having any role in supervising the nursing staff other than phone calls to him by the nursing staff should they wish to discuss a patient's treatment. *Id.* at 37-38.

After his evaluation and diagnosis of Plaintiff's condition, LPN Ross and Deputy Bullock decided to move Plaintiff back to an isolation cell to prevent inmates from hurting themselves or Plaintiff, as the other inmates were seen lifting and pulling on Plaintiff while helping her to and from the bathroom. (Docs. # 73-2 at 76-77; 73-9 at 63; 73-11 at 27-32 and 73-16). LPN Ross instructed Deputy Bullock to keep an eye on Plaintiff and to call the medical unit if there were any changes. (Doc. # 73-2 at 76-77). Plaintiff was placed into the isolation cell on May 18, 2016; however, there is no evidence that Deputy Bullock placed Plaintiff on medical watch. (Doc. # 73-7 at 56). The record indicates that Plaintiff, though in isolation, was not placed on medical watch until 10:50 p.m. on May 20, 2016. *Id.* On May 19, 2016, at the end of his shift, LPN Ross assessed Plaintiff again. He observed Plaintiff limp while walking, but concluded that her condition had not changed; Ross conducted a pass-down to LPN Debbie Preston for the next shift. (Doc. # 73-2 at 77-78, 81, 85).

On her own in the isolation cell, Plaintiff had trouble standing and fell, causing bruises on her body; she also experienced trouble speaking and thinking clearly. (Doc.

---

they read the list of patient notes during their scheduled visits to the facility. (Docs. # 73-2 at 27-29, 44 and 73-3 at 19).

# 73-9 at 64-65, 67).  Plaintiff testified that she wanted more medical attention and grew frustrated that nursing staff would not do more than take her vitals. During this time Corporal Jessica Helton observed Plaintiff repeatedly knock on the isolation cell door and ask for corrections officers because of medical concerns she had.  (Docs. # 73-9 at 64-65 and 73-8 at 42).  Plaintiff asked what she had done to be placed back in isolation, and was told it was for her own safety and the safety of others, not as punishment.  (Docs. # 73-8 at 37, 73; 73-9 at 66 and 73-20).  Plaintiff informed Corporal Helton that her leg would not move, that she could not walk, and that her speech was slurring.  Plaintiff asked Corporal Helton what she could do to make it better.  (Docs. # 73-8 at 27-28; 73-9 at 164 and 73-20).  Corporal Helton saw that Plaintiff was able to lift her leg up in the air and back down and noted "[t]he speech that [Plaintiff] claimed to be messed up was also back to normal, she wasn't stuttering or slurring at this time."  (Doc. # 73-20).  Helton concluded that Kindoll was merely being disruptive and "coming up with something."  However, she did contact the medical unit and advised that Plaintiff was having problems standing. (Docs. # 73-8 at 29-32, 34, 41 and 73-20).

During the day shift on May 19, 2016, Deputy Adams called LPN Debbie Preston to Plaintiff's cell.  Preston documented that Plaintiff "continues to complain of having a stroke." (Docs. # 73-4 at 34-46 and 73-10 at 86-87).  Preston conducted an assessment and concluded that Plaintiff's vitals were fine, though she did not record them.  Nor did Preston review prior entries in Plaintiff's chart, review the protocol binder, or call either NP Washington or Dr. Amos.  *Id.*  Additionally, during her assessment of Plaintiff, just like LPN Ross, LPN Preston performed and improperly interpreted the Babinski test for

neurological issues, interpreting a positive sign for neurological issues as a negative sign. (Docs. # 73-4 at 34-40 and 73-10 at 90-91).

On May 20, LPN Preston assessed Plaintiff again and noted that Plaintiff was still complaining that she could not feel her leg and that she fell and that Plaintiff's right arm curled up at times. (Doc. # 73-4 at 59-64). Nonetheless, Preston observed that Plaintiff's vital signs were normal and "cleared" Plaintiff's condition. *Id.*

During the shift change later in the day on May 20, day shift Corporal Jessica Helton informed night shift Deputy Whitney Jett that Plaintiff had been dragging her leg and complaining of numbness. Helton advised Jett that she had contacted medical several times throughout the day and that Plaintiff had been knocking on the cell window continuously. (Doc. # 73-12 at 31-32, 56-58). During her shift, Jett conducted medical checks on Plaintiff approximately every fifteen to twenty minutes. *Id.* at 80.

At approximately 8:45 p.m. on May 20, Deputy Jett escorted Plaintiff from the isolation cell to a shower room to bathe. (Docs. # 73-12 at 64 and 73-19). Jett observed that Plaintiff was having trouble walking and dragged one of her legs behind her. After taking three or four steps, Plaintiff fell. Deputy Jett asked Plaintiff if she was all right and if she wanted to go to the medical unit. Plaintiff appeared to try to shake her head, but she did not speak. Deputy Jett seated Plaintiff on a chair in the shower room, shut the door, and then contacted the GCDC medical unit by phone. *Id.* After describing the situation to the on-duty nurse, Deputy Jett testified that she was instructed to follow up with the on-duty nurse if there were any changes. (Doc. # 73-12 at 65-66). Jett left the shower room for approximately fifteen to twenty minutes to allow Plaintiff time to shower. *Id.* at 52-56, 66.

To take a shower, Plaintiff was required to repeatedly push a button as water flow automatically shut off periodically. However, Plaintiff found that she was unable to lift her arm from her position on the shower chair to keep the water on, and she only got her hair wet part of the way. She tried to stand up, then fell onto the floor and was unable to get up. (Doc. # 73-9 at 167). After about fifteen minutes, Deputy Jett asked Plaintiff if she was done. Plaintiff answered yes, so Deputy Jett opened the door to the shower and observed Plaintiff sitting on the floor, half dressed. (Docs. # 73-12 at 52-56, 66-68 and 73-19). Jett instructed Plaintiff that she needed to get dressed and could not exit the shower room partially clothed. Jett asked Plaintiff if she was all right and if she still wanted to take a shower, and Plaintiff nodded her head yes. (Doc. # 73-12 at 62).

Concluding that something was wrong, Jett shut the door to the shower room and contacted her supervisor, Corporal Audra Napier, by radio. (Docs. # 73-12 at 52-56; 73-1 at 10, 14-15, and 73-19). As the highest-ranking officer on site during this shift, Corporal Napier was responsible for overseeing the safety and security of the facility and overseeing the jail, staff, and inmates. (Doc. # 73-1 at 9). Napier advised that she would be there momentarily. (Doc. # 73-12 at 52-56, 71).

After radioing Corporal Napier, approximately ten minutes passed and Deputy Jett again opened the shower door to ask Plaintiff if she was ready. Though Plaintiff again said yes, Deputy Jett found Plaintiff still sitting on the floor in the same position, half dressed. (Docs. # 73-12 at 52-56, 70 and 73-19). Deputy Jett noted that Plaintiff for the most part made no response and just looked at Jett; at other times, it appeared Plaintiff was moving her mouth slightly to try to speak, but nothing was coming out. Plaintiff's bizarre behavior struck Jett as unusual and she was concerned that Plaintiff was not just

experiencing routine drug withdrawal. (Docs. # 73-12 at 59, 61, 69-70, 82, and 73-19). Deputy Jett once again verbally instructed Plaintiff to get dressed. Jett closed the shower again and radioed Corporal Napier a second time, advising that Napier needed to come immediately. (Docs. # 73-12 at 52-56, 71 and 73-19).

When Corporal Napier arrived a few minutes later, she opened the shower door and observed Plaintiff was sitting on the floor, half dressed, with the water off. (Docs. # 73-1 at 15-16; 73-9 at 169; 73-12 at 52-56 and 73-19). Napier advised that she would be taking Plaintiff to the medical unit, and she instructed Plaintiff to get dressed before coming out of the shower room to go to medical. (Docs. # 73-1 at 16-17; 73-12 at 52-56 and 73-19). Plaintiff appeared to try and get dressed, so Jett and Napier shut the shower door again to give her privacy. (Docs. # 73-1 at 18 and 73-12 at 52-56). Jett and Napier waited a few more minutes and opened the shower door again. They observed Plaintiff, partially dressed, and flailing her arms before falling from the shower chair onto the floor. (Docs. # 73-12 at 52-56; 72-77 and 73-19). Napier and Jett discussed that they needed to go ahead and get Plaintiff dressed and get Plaintiff to the medical unit immediately; accordingly, they helped Plaintiff get dressed by holding her clothes for her while she stepped into them. (Docs. # 73-1 at 15; 73-12 at 56-56, 77-78 and 73-19). Napier and Jett then assisted Plaintiff into a wheelchair. (Docs. # 73-12 at 78-79 and 73-19).

By approximately 9:48 p.m. on May 20, 2016, about one hour after Plaintiff fell on her way to the shower, Corporal Napier transported Plaintiff to medical by wheelchair. Licensed Registered Nurse (RN) David Watkins was on shift and performed the assessment. (Docs. # 73-1 at 15; 73-3 at 7, 26, 81; 73-7 at 79; 73-12 at 78-79 and 73-19). During his assessment of Plaintiff, just like LPNs Ross and Preston, RN Watkins

performed and improperly interpreted the Babinski test as negative for neurological issues; however, Watkins was able to recognize that Plaintiff was displaying stroke symptoms. (Doc. # 73-3 at 46-48, 96-101). Specifically, RN Watkins observed that Plaintiff was having trouble speaking, could not raise her arms equally, and could not write her name accurately. (Docs. # 73-3 at 26 and 73-10 at 92-94). Watkins did not consult with LPN Ross or LPN Preston about Plaintiff's condition; nor did he call Dr. Amos or NP Washington or send Plaintiff to the hospital. (Doc. # 73-3 at 30). Rather, it appears that at 10:51 p.m. on May 20, 2016, Plaintiff was taken back to an isolation cell and placed on medical watch. (Docs. # 73-3 at 52-56, 81; 73-12 at 79-80 and 73-19).

Deputy Jett testified that she was surprised Plaintiff was sent back to x-block from medical because she felt like "something was still wrong." (Doc. # 73-12 at 82). Jett was uncertain because she did not observe the assessment and had no medical experience; however, based on her observations, she grew concerned that the medical unit should have done something more and that simply continuing to monitor Kindoll by having a deputy checking in every 15 minutes was not sufficient. *Id.* at 82-84, 113-114. Jett shared her concern with Corporal Napier. Napier responded that she would "make some phone calls" and instructed Jett to keep an eye on Plaintiff. (Doc. # 73-12 at 84). Deputy Jett continued to look in Plaintiff's isolation cell every fifteen minutes, and observed that Plaintiff appeared to be sleeping. *Id.* at 86.

In the early morning hours of May 21, 2016, RN Watkins decided to send Plaintiff to the hospital. (Doc. # 73-3 at 28, 50-51, 55-62). Corporal Napier returned to x-block and informed Deputy Jett that Plaintiff was going to the hospital. Napier assisted Plaintiff into the wheelchair and transported her out of x-block. (Doc. # 73-12 at 86-87). At about

1:47 a.m. on May 21, 2016—approximately three hours after Napier transported Plaintiff to medical by wheelchair—Plaintiff was taken to St. Elizabeth Grant County Hospital. (Docs. # 73-3 at 28, 50-51, 55-62 and 73-7 at 88).

RN Watkins testified that he does not remember whether he placed Plaintiff back on "medical watch" in the isolation cell for the three hours Plaintiff waited prior to being transported to the hospital; however, he admitted that if he failed to act immediately, he violated the stroke protocol set forth in the SHP Treatment Guidelines. (Docs. # 73-3 at 81 and 73-10 at 102). The treatment protocol for recognition of a stroke or stroke symptoms required assessment for symptoms such as weakness in the face, arm, or legs, especially on one side of the patient's body; sudden confusion; sudden trouble seeing in one or both eyes; trouble speaking, or difficulty understanding speech; trouble walking; and dizziness, loss of balance, or lack of coordination. Moreover, the treatment protocol used the acronym "F.A.S.T" and cautioned that "[i]f you think someone is having a stroke, act F.A.S.T." The letter "T" in the acronym stands for "Time." The protocol notes that "[i]f you observe **ANY** of these signs, call 911/EMS—Acting fast can help stroke patients get the treatments they need." (Docs. # 73-3 at 51-52 and 73-10 at 78-50).

After being transported to the hospital, Plaintiff was informed that she had suffered multiple strokes. She testified that she suffers permanent injuries including impaired speech and mobility as a result. (Doc. # 73-9 at 83-84, 88-91, 153-156). Plaintiff's expert neurologist, David F. Lang, M.D., opined that had Plaintiff been transferred to the emergency room when she first reported her stroke symptoms the evening of May 18, 2016, more likely than not, Plaintiff would have been a candidate to receive interventional medicine before the treatment window closed and more likely than not would have been

spared many of the deficits caused by the stroke. (Docs. # 83-1 at 6-7; 83-9 and 86-2 at 49-58, 67-69).

Plaintiff presented evidence that the GCDC has a history of failing to provide the constitutionally-minimum medical treatment to inmates with serious or potentially serious acute medical conditions like strokes. Beginning in 2003, the United States Department of Justice (DOJ) initiated an investigation of the GCDC.[3] (Doc. # 73-26 at 1). On May 18, 2005, the DOJ reported its findings to the GCDC. (Doc. # 73-25). Among its findings, the DOJ concluded that the provision of acute medical care at GCDC "appears to deviate from constitutionally minimum standards" and specifically that "GCDC consistently fails to provide reasonable medical treatment to inmates with serious or potentially serious acute medical conditions." (Doc. # 73-25 at 7).

The DOJ found "a host of management deficiencies," including "the inadequate medical care at GCDC [which] appears to result primarily from the shortage of medical staff at the facility." (Doc. # 73-25 at 10). The DOJ pointed out that "[a] physician on-site for two to three hours per week . . . is clearly insufficient to provide the medical care required for an institution the size of GCDC." (Doc. # 73-25 at 10). Further, the DOJ found that GCDC "lacks policies on, *inter alia*, timeliness of access to medical care," or "protocols for the nurse or the correctional staff to use to ensure timely access to the physician when presenting symptoms requiring physician care." *Id.* Moreover, "many of [the] facility's policies and procedures lack the breadth and specificity to form an

---

[3]     The DOJ investigation was conducted pursuant to the Civil Rights of Institutionalized Persons Act of 1980 (CRIPA), 42 U.S.C. § 1997, which grants the Attorney General authority to investigate and seek equitable relief to remedy unlawful patterns or practices that violate the constitutional rights of institutionalized people. *See Patsy v. Fla. Bd. of Regents*, 457 U.S. 496, 507-08 (1982) (explaining that CRIPA "was enacted primarily to ensure that the United States Attorney General has legal standing to enforce existing constitutional and federal statutory rights of institutionalized persons").

infrastructure to ensure timely access to the appropriate level" of medical care. (Doc. # 73-25 at 12). Additionally the DOJ found that the GCDC failed to keep organized and sufficiently-detailed medical records, which contributed to the failure to provide adequate medical care. (Doc. # 73-25 at 12-13).

In 2009, the Grant County attorney signed the DOJ's Proposed Resolution, which recognized improvements but also set forth "a few areas of remaining concern regarding the County's provision of medical and mental health care" which required "future oversight" by the DOJ. (Doc. # 73-26 at 5). The Proposed Resolution listed sixteen "remedial measures" for Grant County to implement, including an agreement that:

> (2) The County will continue to provide sufficient on-site physician, mental health care provider, and nursing staff to ensure adequate medical care (including chronic and acute care). The County also will continue to provide sufficient on-site physician staffing to adequately supervise nursing staff.
>
> (7) The County will continue to ensure that all inmates with serious or potentially serious acute medical conditions receive necessary examination, diagnosis, monitoring, and treatment, including referrals to appropriate outside medical professionals when clinically indicated.
>
> (16) The County will continue to maintain on-site complete, confidential, and appropriately organized medical and mental health records for each inmate. The County will continue to ensure that such records include sufficient information (including symptoms, the results of physical evaluations, and medical staff progress notes) to ensure that health services staff have all relevant information available when treating inmates.

(Doc. # 73-26 at 2-4).

On October 14, 2014, the DOJ provided the Grant County attorney with another assessment regarding conditions at GCDC. (Doc. # 73-13 at 2). The letter noted that "[i]n our last compliance letter, we acknowledged that a new Jail administration and

contractor were in place [and] understood that they might not have had as much time to fully evaluate their obligations under the Agreement and take remedial action." (Doc. # 73-13 at 14). The assessment went on to state, however, that "enough time has now passed that the County's lack of progress is much more troubling." *Id.* The DOJ found that "the County has made little progress" in addressing the deficiencies identified in its August 3, 2009 Resolution, including a failure to provide prisoners "with adequate access to qualified clinical staff and mental health services." (Doc. # 73-13 at 2).

Aware of management issues at the GCDC, Christopher Hankins ran against the incumbent Jailer and was elected to the position in 2015. (Doc. # 73-7 at 5, 10-11). As the Jailer, Hankins has the final power to adopt policy for the jail, as well as the policy and procedure manual, and he has the final power to hire, fire, and discipline personnel. *Id.* at 18. Hankins also has the ultimate responsibility for determining if the deputy jailers are acting consistent with policy and making sure inmates are safe and secure. *Id.* at 62.

In order to try to comply with the Department of Justice Resolution, Hankins hired contractor Southern Health Partners, Inc. (SHP), and SHP began providing medical care at the GCDC in the latter part of 2015. *Id.* at 28-29, 33, 35-36. Hankins testified that he and his staff met with SHP about coming into compliance with the DOJ agreement. *Id.* at 104-105. However, Jailer Hankins testified that he did not personally do anything to monitor the type of health care inmates were receiving at GCDC during the time SHP was the medical provider and that no one at Grant County had any responsibility for supervising the SHP medical staff. *Id.* at 32-33.

Moreover, Jailer Hankins testified that he delegated the monitoring of the medical care provided by SHP to his brother, Major of Operations Jason Hankins. *Id.* at 15, 66-

67. Jailer Hankins testified that while he may have "skimmed through" the DOJ's August 3, 2009 Resolution (Doc. # 73-26), he has never seen the DOJ's May 18, 2005 findings (Doc. # 73-25). *See* (Doc. # 73-7 at 94, 97, 99). Further, Jailer Hankins testified that he is not aware how Jason Hankins monitored SHP and is not sure if Jason Hankins had any regular meetings with the medical staff from SHP, or received or reviewed any reports from SHP prior to Plaintiff's stroke. *Id.* at 29-32. Jailer Hankins testified that he does not recall any investigation into Plaintiff's incident at the GCDC, and to his knowledge no disciplinary action was taken against the SHP nurses or the GCDC employees as a result of the incident. *Id.* at 72, 70-72. The DOJ monitoring was ongoing at the time of Plaintiff's stroke, as the GCDC has not been found in compliance with the DOJ Resolution, and the record indicates that DOJ representatives were at GCDC for an inspection as recently as 2017. (Docs. # 73-7 at 93-94, 97, 102 and 73-10 at 44-46).

## II.    ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate when the record reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The "moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). Once a party files a properly-supported motion for summary judgment, by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the

adverse party must set forth specific facts showing that there is a genuine issue for trial."
*Anderson*, 477 U.S. at 250. However, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." *Id.* at 252.

The Court must "accept Plaintiff's evidence as true and draw all reasonable inferences in [her] favor." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 255). The Court may not "make credibility determinations" or "weigh the evidence when determining whether an issue of fact remains for trial." *Id.* (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251-52). If there is a dispute over facts that might affect the outcome of the case under governing law, the entry of summary judgment is precluded. *Anderson*, 477 U.S. at 248.

As the moving parties in each of their respective motions, the County Defendants and SHP Defendants must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of each of Plaintiff's claims against which they seek dismissal. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming Defendants satisfy their burdens, Plaintiff must—by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials"— show specific facts that reveal a genuine issue for trial. Fed. R. Civ. P. 56(c)(1)(A); *Laster*, 746 F.3d at 726 (citing *Celotex*, 477 U.S. at 324). Furthermore, "the trial court no longer

has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).

### B.    County Defendants' Motion for Summary Judgment

The County Defendants assert four central arguments in support of their Motion for Summary Judgment.[4]  First, Defendants argue that Plaintiff's official-capacity § 1983 claims against the individually-named Defendants should be dismissed as redundant because Plaintiff also named the County as a party.  (Doc. # 62-1 at 11-15).  Second, Defendants argue that Plaintiff's § 1983 claim against Grant County should be dismissed because Plaintiff failed to demonstrate the requisite "policy or custom" to invoke municipal liability.  *Id.* at 26-29.  Third, Defendants argue that Plaintiff's individual-capacity § 1983 claims against the individually-named defendants should be dismissed because qualified immunity bars the suit and because the defendants were not deliberately indifferent to Plaintiff's medical needs.  *Id.* at 20-26; 29-37.  Finally, Defendants argue that qualified immunity bars Plaintiff's state-law claim for negligence against the individually-named defendants.  *Id.* at 12-20.  Each argument will be addressed in turn.  For the reasons set forth below, the County Defendants' Motion for Summary Judgment is **granted in part** and **denied in part**.

### 1.    *Summary judgment is proper as to Plaintiff's § 1983 claim against the individually-named Defendants in their official capacities.*

The County Defendants' first argument asserts that the individually-named

---

[4]      Two of Plaintiff's four causes of action involve the County Defendants.  First, Plaintiff alleges a claim pursuant to 42 U.S.C. § 1983 against Defendants Corporal Audra Napier, Deputy Tammy Bullock, Jailer Christopher Hankins, and John and Jane Doe (the "individually-named Defendants"), in both their individual and official capacities, as well as against Grant County (Count One).  (Doc. # 1 at 11).  Second, Plaintiff alleges a state-law negligence claim against Defendants Audra Napier, Tammy Bullock, and John and Jane Doe (Count Four).  *Id.* at 12.  The County Defendants seek summary judgment on both counts.

Defendants—Audra Napier, Tammy Bullock, Christopher Hankins, and John and Jane Doe[5]—are entitled to summary judgment as to Plaintiff's official-capacity claim under 42 U.S.C. § 1983 (Count One), because these claims are redundant to Plaintiff's claim against Grant County itself. (Doc. # 62-1 at 11). Plaintiff concedes that "her official capacity claims against the individual County defendants amount to a claim against Grant County, which was also named as a party." (Doc. # 73 at 43). The Court agrees that "as a matter of housekeeping," because Plaintiff has brought suit against Grant County directly, "there is no longer a need to bring official-capacity actions against local government officials." *C.K. v. Bell Cty. Bd. of Educ.*, 839 F. Supp.2d 881, 884 (E.D. Ky. 2012) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-67 (1985)). Accordingly, summary judgment is **granted** as to Plaintiff's official-capacity § 1983 claim against these Defendants.

### 2. Summary judgment is proper as to Plaintiff's remaining claims against John and Jane Doe.

Plaintiff named Defendants John and Jane Doe in Count One and Count Four of her Complaint. (Doc. # 1 at 2). As to Count One, in addition to conceding that dismissal is appropriate as to her official-capacity claim against each of the individually-named Defendants, Plaintiff has "put forth no arguments as to why the individual-capacity claim against [John and Jane] Doe should survive summary judgment analysis."[6] *Delong v.*

---

[5] The County Defendants' Motion for Summary Judgment also moved on behalf of Defendants Dedi Adams, Jessica Helton, and Whitney Jett; however, after the County Defendants filed their dispositive motion, these Defendants were dismissed from this civil action by agreement of the parties. (Doc. # 75). Thus, the remaining Grant County Defendants are Grant County, and (in their official and individual capacities) Audra Napier, Tammy Bullock, Christopher Hankins, and John and Jane Doe. *See* (Doc. # 73 at 44). Accordingly, the County Defendants' Motion for Summary Judgment as to Defendants Dedi Adams, Jessica Helton, and Whitney Jett will be **denied as moot**.

[6] The Court also notes that as to Defendants John and Jane Doe, after a significant period of discovery Plaintiff has never identified these individuals, moved to name these individuals, or moved to

*Arms*, No. 06-77-GFVT, 2007 WL 4510323, at *9 (E.D. Ky. Dec. 21, 2007). Indeed, Plaintiff does "not once mention or allude to the individual-capacity claims against [John and Jane] Doe in [her] Response." *Id.* Accordingly, because Plaintiff has failed to direct the Court to specific portions of the record that she asserts create a genuine issue of material fact, Plaintiff's § 1983 individual-capacity claim against John and Jane Doe fails and summary judgment is **granted**. *See id. See also Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 996 (6th Cir. 1994) (finding that where a § 1983 action could not be asserted successfully against a Doe defendant, summary judgment is appropriately awarded).

As to Count Four, Plaintiff has likewise failed to show why the negligence claim against John and Jane Doe should survive summary judgment analysis. Plaintiff failed to point to any materials in the record that show specific facts revealing a genuine issue for trial; without even a scintilla of evidence in support of her position, the Court will **grant** summary judgment to these Defendants on the negligence claim contained in Count Four of the Complaint. *Copen v. Noble Cty.*, No. 2:13-cv-00610, 2016 WL 687593, at *5 (S.D. Ohio Feb. 19, 2016). *See also* Fed. R. Civ. P. 56(c)(1)(A); *Laster*, 746 F.3d at 726 (citing *Celotex*, 477 U.S. at 324).

### 3. *Defendant Grant County is not entitled to summary judgment as to Plaintiff's § 1983 claim.*

The County Defendants next argue that Defendant Grant County is entitled to summary judgment as to Plaintiff's claim under 42 U.S.C. § 1983 because Plaintiff has not demonstrated any "policy or custom" that caused her injury. (Doc. # 62-1 at 26).

---

amend or join a party; nor has she served them with timely process pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. *See Petty v. Ohio*, 478 F.3d 341, 345-46 (6th Cir. 2007), abrogation on other grounds recognized by *Bailey v. City of Ann Arbor*, (6th Cir. 2017).

Defendants' argument fails.  Accepting Plaintiff's evidence as true and drawing all reasonable inferences in her favor, *see Anderson*, 477 U.S. at 255, the Court finds that Plaintiff has set forth sufficient evidence of the requisite policy or custom to show that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324.

To impose municipal liability pursuant to 42 U.S.C. § 1983, a plaintiff must prove that a constitutional violation occurred and that the municipality is responsible for the violation.  *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 498 (6th Cir. 2008) (internal citation omitted); *Crouch v. S. Health Partners, Inc.*, No. 1:08-cv-P89-R, 2009 WL 860414 (W.D. Ky. Mar. 27, 2009) (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992)).  Further, there must be a "direct causal link" between a municipal policy or custom and the alleged deprivation, and such policy or custom must be the "moving force" of the constitutional violation.  *Crouch*, 2009 WL 860414, at *3 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); *see also Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001).  Stated another way, a plaintiff must (1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that the plaintiff incurred a particular injury due to execution of that policy.  *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)). "These stringent standards are necessary to avoid *de facto respondeat superior* liability explicitly prohibited by *Monell*."  *Graham v. Cty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (citing *Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996)).

The County Defendants argue that summary judgment as to Plaintiff's § 1983 claim against Grant County is proper because Plaintiff "has not pointed to any policy or custom that caused Plaintiff's injury."  (Doc. # 62-1 at 28).  In order to demonstrate the requisite

"municipal policy or custom" leading to the alleged violation, "a plaintiff can identify: (1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Winkler v. Madison Cty.*, 893 F.3d 877, 901 (6th Cir. 2018) (citing *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015)). Pointing to carefully-tailored selections of Plaintiff's deposition testimony, the County Defendants seek to frame Plaintiff's treatment at GCDC narrowly as an "isolated occurrence that affected only Plaintiff" rather than the result of the requisite "policy or custom." (Doc. # 62-1 at 29). The County Defendants point to Plaintiff's testimony, for example, that she was not personally aware of GCDC's treatment protocols, she was not aware of any other inmates at GCDC who specifically suffered from a stroke, and that she was regularly seen by medical staff despite not expressly requesting medical care. (Doc. # 62-1 at 28-29).

The County Defendants' selective citation of Plaintiff's deposition testimony alone, however, ignores a wealth of contrary evidence in the record that the failure to promptly treat Plaintiff's acute medical need was far from an isolated incident at GCDC. Rather, "[a] review of the record reveals a prison system in crisis." *Taylor v. Mich. Dep't of Corrs.*, 69 F.3d 76, 83 (6th Cir. 1995). First, Plaintiff's own lack of knowledge of the GCDC treatment protocol is irrelevant; it is the mental state of *Defendants* that is at issue in a § 1983 claim. *See Winkler*, 893 F.3d at 901-02. Defendants' assertion that Plaintiff did not expressly ask for medical assistance is equally unavailing in light of multiple witnesses' testimony that Plaintiff, though confused and limited at times in her ability to move, think, and speak, made the GCDC staff aware of her symptoms and actively sought

help on numerous occasions prior to her hospitalization. *See, e.g.*, (Docs. # 73-8 at 27-28, 42; 73-9 at 48-49, 55-56, 61, 64-65, 153, 164; 73-12 at 56-58 and 73-20).

Further, while there is no evidence of other inmates who suffered from a stroke specifically, there is evidence that the delay in treating Plaintiff's acute condition was not a mere isolated incident. The record demonstrates DOJ findings that GCDC "lacks policies on, *inter alia*, timeliness of access to medical care," or "protocols for the nurse or the correctional staff to use to ensure timely access to the physician when presenting symptoms requiring physician care." (Doc. # 73-25 at 12). As a result, the DOJ concluded that the provision of acute medical care at GCDC "deviates from constitutionally minimum standards" and that "GCDC consistently fails to provide reasonable medical treatment to inmates with serious or potentially serious acute medical conditions" such as a stroke. (Doc. # 73-25 at 7, 12). No evidence indicates that circumstances have changed since the DOJ report was authored.

Next, Defendants' argument that Plaintiff was regularly "seen" by medical staff artificially narrows the relevant scope of inquiry. Being "seen" does not always equate to being "treated" within constitutionally minimum standards. There is evidence that, while Plaintiff was "seen" by medical, the medical staff continued to merely "monitor" Plaintiff instead of providing emergency treatment—in the case of RN Watkins, even *after* he determined that Plaintiff required hospitalization. *See, e.g.*, (Docs. # 73-3 at 28, 50-51, 55-62, 81; 73-4 at 34-44, 59-64, 73-7 at 88 and 73-12 at 82-84, 113-114).

The County Defendants' argument on this point ignores the fact that, while "a court will not second-guess the judgment of the medical professionals providing such treatment," a plaintiff may overcome this presumption by showing that such "treatment"

was "so woefully inadequate as to amount to no treatment at all." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011). The County Defendants' argument sidesteps the evidence that the County was aware of a continuing pattern of delay in securing acute care. In sum, the County Defendants' arguments fall short of satisfying their burden of showing the absence of any genuine issues of material fact that a municipal policy or custom was the driving force a deprivation of Plaintiff's constitutional right to medical care. *See Alkire*, 330 F.3d at 815.

In contrast, Plaintiff has presented facts from which a jury could find that the conditions leading to her injuries were not "isolated," but rather Grant County had a longstanding policy or custom that caused a violation of Plaintiff's constitutional right to adequate medical care. While Jailer Hankins contracted with SHP to provide medical services at GCDC, it is well-established that "contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody." *West v. Atkins*, 487 U.S. 42, 56 (1988); *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1250 (6th Cir. 1989). Jailer Hankins knew that GCDC had not been found in compliance with the DOJ agreement, but he did not do anything to monitor the type of health care inmates were receiving at GCDC during the time SHP was the medical provider, such as implement a quality assurance program. (Doc. # 73-7 at 28-36, 102). *See McCullum v. Tepe*, No. 1:08-CV-387, 2011 WL 13186318, at *8 (S.D. Ohio Mar. 28, 2011) (stating that the lack of a quality assurance program provides evidence of deliberate indifference).

Further, Jailer Hankins testified that he had no personal involvement in monitoring the health care being provided to inmates at GCDC; that no one at Grant County had any

responsibility for supervising the SHP medical staff; that he fully delegated oversight of medical services to his brother, who had no corrections experience; that he did not have any awareness of how his brother provided oversight, if any; that he had no idea if his brother met with SHP; that he received no reports or statistics about the medical care provided by SHP; that he was only generally aware of the DOJ's attempts to bring GCDC into compliance pursuant to the agreed-upon Resolution; and that he did not review the the DOJ findings.  (Doc. # 73-7 at 15, 29-33, 66-67, 94-99).  Jailer Hankins and Grant County officials were aware that GCDC provided constitutionally inadequate medical care to inmates, and that the DOJ had still not found GCDC to be in compliance during the relevant time period.  The testimony of Jailer Hankins, and DOJ documents relied upon by Plaintiff, create a genuine issue of material fact as to whether the County "at least implicitly authorized, approved, or knowingly acquiesced" in unconstitutional conduct.  *Hays v. Jefferson Cty.*, 668 F.2d 869, 874 (6th Cir. 1982); *Winkler*, 893 F.3d at 902-03.

The County Defendants seek to vitiate Plaintiff's reliance on the Department of Justice documents related to its CRIPA investigation of GCDC as evidence of the requisite policy or custom by contesting the admissibility of the documents. (Doc. # 62-1 at 28).  The County Defendants argue for the first time in their Reply brief—obstructing Plaintiff's ability to respond—that the DOJ documents should be inadmissible public records under Rule 803(8) of the Federal Rules of Evidence as they indicate a lack of trustworthiness.  (Doc # 77 at 4-8) (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988); *Bank of Lexington & Trust Co. v. Vining-Sparks Sec., Inc.*, 959 F.2d 606, 616 (6th Cir. 1992)).  The County Defendants assert that the majority of the DOJ documents relied upon by Plaintiff are too attenuated in time—stemming from a 2003 investigation—

to be sufficiently trustworthy under Rule 803(8).  *See* (Doc. # 77 at 6-7).

This argument sidesteps evidence in the record that the DOJ's 2003 investigation was ongoing.  The record shows that the same pertinent issues identified in the DOJ's 2005 findings—including inadequate protocol for acute care—continued to be raised by the DOJ.  *See, e.g.*, (Doc. # 73-13 at 2).  Additionally, it appears that the GCDC was still being monitored at the time of Plaintiff's stroke, and DOJ representatives were present at the GCDC for an inspection as recently as 2017.  Jailer Hankins was aware of the DOJ investigation, and SHP representatives hired by Hankins were present for one of the inspections.  (Docs. # 73-7 at 93-97, 102 and 73-10 at 44-46).

Thus, the County Defendants' objections are unconvincing, and the Court finds that the DOJ documents are sufficiently trustworthy under Rule 803(8) of the Federal Rules of Evidence.[7]  *See, e.g.*, *Daniel v. Cook Cty.*, 833 F.3d 728 (7th Cir. 2016) (findings from DOJ investigation of health care provided at county jail were admissible under hearsay exception); *Shepherd v. Dallas Cty.*, 591 F.3d 445, 457-58 (5th Cir. 2009) (admitting 2006 DOJ report on investigation of health care at Dallas County Jail); *McDaniels v. City of Philadelphia*, 234 F. Supp. 3d 637, 649 (E.D. Pa. 2017) (admitting DOJ report under hearsay exception at summary-judgment stage of § 1983 action); *Moses v. Westchester Cty. Dep't of Corr.*, No. 10-CIV-9468, 2017 WL 4386362, at *11 (S.D.N.Y. Sept. 29, 2017) (finding DOJ Report "satisf[ies] the criteria of Rule 803(8)").  The DOJ documents relied upon by Plaintiffs provide probative and admissible evidence

---

[7]    Moreover, even if the DOJ documents were inadmissible under Rule 803(8), courts have found similar documents admissible for non-hearsay purposes such as notice.  *See, e.g.*, *Talley v. Dart*, No. 08-C-5485, 2012 WL 1899393, at *5 (N.D. Ill. May 24, 2012) (considering DOJ letter on summary judgment not for the truth of the matters asserted, but "for the fact that the . . . defendants had been placed on notice by DOJ in July 2008 of possible problems with the provision of medical care and the processing of medical grievances").

in support of Plaintiff's § 1983 custom or policy claim against Grant County.

The County Defendants have failed to demonstrate that there is no genuine issue of material fact as to whether there is a direct causal link between a municipal policy or custom that was the moving force behind the deprivation of Plaintiff's constitutional right to adequate medical care. *Alkire v. Irving*, 330 F.3d at 815. Accordingly, the County Defendants' Motion for Summary Judgment as to Plaintiff's claim under 42 U.S.C. § 1983 against Grant County is **denied**.

### 4. *Defendants Napier, Bullock, and Hankins, in their individual capacities, are not entitled to summary judgment as to Plaintiff's § 1983 claim.*

The County Defendants next argue that they are entitled to summary judgment as to Plaintiff's claim under 42 U.S.C. § 1983 against Defendants Hankins, Napier, Bullock, in their individual capacities, because they are shielded from suit by qualified immunity. "To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law."[8] *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). However, under the doctrine of qualified immunity, "government officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Jerauld ex rel. Robinson v. Carl*, 405 F. App'x 970, 975 (6th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

---

[8] The Defendants do not contest that they acted under color of state law.

In order to resolve whether these defendants are entitled to qualified immunity, the Court must examine (1) "whether [Plaintiff] has alleged facts which, when taken in the light most favorable to her, show that the defendant-official[s'] conduct violated a constitutionally protected right" and (2) "whether that right was clearly established such that a reasonable official, at the time the act was committed, would have understood that his [or her] behavior violated that right." *Jerauld*, 405 F. App'x at 975 (citing *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 20001); *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543 (2009) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009) (discussing flexible application of the two-part qualified-immunity test)).  To demonstrate a violation of her Eighth Amendment right to medical care, Plaintiff must demonstrate that each of the individually-named County Defendants acted with "deliberate indifference" to her serious medical needs.[9] *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Comstock*, 273 F.3d at 702.

"A constitutional claim for deliberate indifference contains both an objective and a subjective component." *Dominguez*, 555 F.3d at 550; *Jerauld*, 405 F. App'x at 975.  The objective component requires a plaintiff to show the existence of a "sufficiently serious" medical need. *Dominguez*, 555 F.3d at 550 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *Jerauld*, 405 F. App'x at 975.   The County Defendants do not dispute Plaintiff was hospitalized and treated for stroke symptoms; accepting Plaintiff's evidence as true and drawing all reasonable inferences in her favor, *see Laster*, 746 F.3d at 726, Plaintiff has demonstrated a sufficiently serious medical need.  *Dominguez*, 555 F.3d at 550.

---

[9]    "While the Eighth Amendment does not apply to pre-trial detainees, the Due Process Clause of the Fourteenth Amendment does provide them with a right to adequate medical treatment that is analogous to prisoners' rights under the Eighth Amendment." *Jerauld*, 405 F. App'x at 975 (citing *Gray v. City of Detroit*, 399 F.3d 612, 615-16 (6th Cir. 2005).  The Sixth Circuit has made clear that a pretrial detainee's analogous claim in these circumstances "is governed by the 'deliberate indifference' standard." *Miller v. Calhoun Cty.*, 408 F.3d 803, 812 (6th Cir. 2005).

Therefore, the objective prong is satisfied and the Court's inquiry into whether the County Defendants have engaged in a constitutional violation within the scope of the qualified-immunity exception will focus on the second, subjective prong of the deliberate-indifference test. *See Darrah v. Krisher*, 865 F.3d 361, 374 (6th Cir. 2017) (stating that inquiry into whether defendants' conduct violated a constitutional right "collapses into the analysis of whether [the defendant was] . . . deliberately indifferent to [the plaintiff's] medical needs under the subjective component of the deliberate-indifference standard."); *Parsons v. Caruso*, 491 F. App'x 597, 602 (6th Cir. 2012); *Clark-Murphy v. Foreback*, 439 F.3d 280, 286-87 (6th Cir. 2006).

The subjective component requires a plaintiff to show that the official "subjectively perceived facts from which to infer substantial risk to the prisoner, that he [or she] did in fact draw the inference, and that he [or she] then disregarded that risk." *Comstock*, 273 F.3d at 703 (citing *Farmer*, 511 U.S. at 837). Requiring "a degree of culpability greater than mere negligence" but less than a "specific intent to harm," the subjective standard is equivalent to a reckless disregard of the risk of harm. *Comstock*, 273 F.3d at 703 (citations omitted); *Perez*, 466 F.3d at 424. Raising the standard from negligence to recklessness "is meant to prevent the constitutionalization of medical malpractice claims." *Comstock*, 273 F.3d at 703. A plaintiff may demonstrate the subjective component by "inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Dominguez*, 555 F.3d at 550 (citing *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)).

Upon a showing that a defendant was deliberately indifferent in violation of a plaintiff's constitutionally-protected right, a § 1983 claim will still be barred by sovereign immunity unless the plaintiff shows that "the constitutional right was clearly established" at the time of the violation. *Jerauld*, 405 F. App'x at 976 (citing *Comstock*, 273 F.3d at 703). "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what [he or she] is doing violates that right." *Dominguez*, 555 F.3d at 552 (citing *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)).

The County Defendants do not contest that Plaintiff was entitled to medical care and attention under the Fourteenth Amendment; rather, the arguments go to the timing of the incident and the County Defendants' notice of Plaintiff's risk of harm. The Sixth Circuit "ha[s] long held that prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner." *Jerauld*, 405 F. App'x at 976 (citing *Comstock*, 273 F.3d at 702). Therefore, the central inquiry focuses upon the subjective component—whether the individual County Defendants identified Plaintiff's risk of harm and responded with deliberate indifference. *Jerauld*, 405 F. App'x at 976; *Dominguez*, 555 F.3d at 552. Accordingly, the Court will examine Plaintiff's evidence against each of the individual-capacity County Defendants in turn. *See Doe*, 103 F.3d at 511 (stating that Court "must begin with the preliminary determination of whether [the plaintiff] has stated a claim under section 1983 against each individual defendant."); *Smith v. Cty. of Lenawee*, 505 F. App'x 526, 532 (6th Cir. 2012) (recognizing that individual officials' "entitlement to qualified immunity rests on the role each of them played").

### a. *Audra Napier*

Corporal Audra Napier was working the night shift on May 20, 2016. (Doc. # 73-1 at 9).   As the highest-ranking officer on site, she was responsible for overseeing the inmates.   *Id.*   Corporal Napier's first interaction with Plaintiff occurred that evening, when Deputy Jett radioed that she needed assistance with a female in the shower.   *Id.* at 10, 14-15.   While Napier testified that she was not aware of any problems Plaintiff was having prior to being radioed by Jett, Deputy Jett testified that she explained the situation over the radio and let Napier know it was urgent.   *Id.* at 15; *see also* (Docs. # 73-12 at 71 and 73-19).

Napier herself then observed Plaintiff exhibit bizarre behavior, as well as an inability to respond to questions, dress herself, or stand.  (Doc. # 73-12 at 71-78).  Napier transported Plaintiff to the medical unit for an evaluation and then brought her back to x-block less than an hour later; when she returned, Deputy Jett voiced concern that medical had again merely returned Plaintiff to her isolation cell.  *Id.* at 81-84.  Deputy Jett testified that she told Corporal Napier "something needs to be done, we have to do something."  *Id.* at 84.  Napier—deterring Jett from possibly pursuing further assistance—responded that she was going to "make some calls" and "would let [Jett] know."  *Id.*  There is no evidence in the record that Napier took any action, however, to secure medical care, and instead merely finished out her shift.

Based upon these facts, there is evidence that Napier had "a reason to believe (or actual knowledge) that prison doctors or their assistants [were] mistreating (or not treating) a prisoner."  *See Smith v. Cty. of Lenawee*, 505 F. App'x 526, 533 (6th Cir. 2012) (citing *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)).  *See also Clark-Murphy v.*

*Foreback*, 439 F.3d 280, 290 (6th Cir. 2006) (denying qualified immunity when referral to medical attention had not secured the necessary assistance for an inmate). "When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates [a] constitutional infirmity." *Darrah*, 865 F.3d at 372 (citing *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899 (6th Cir. 2004)).

Napier's exposure to Plaintiff's condition and assurance to Jett that she would "make some calls" in response to Jett's concerns provides evidence that Napier "subjectively perceived facts from which to infer substantial risk to the prisoner, [and] that [she] did in fact draw the inference." *Comstock*, 273 F.3d at 703. The record shows that for several hours, despite her assurance to Jett, Napier did nothing to secure Plaintiff medical care. Napier's failure to "make some calls" or follow up in any way, and her "inadequate monitoring of a detainee whom she knew to need medical treatment," is enough evidence for a jury to find that Napier "then disregarded that risk" she had perceived and inferred. *Smith*, 505 F. App'x at 537; *Comstock*, 273 F.3d at 703.

The County Defendants argue that at the time of her stroke, Plaintiff "thought the symptoms she was experiencing were symptoms associated with her detoxification from heroin." (Doc. # 77 at 11). Further, the County Defendants note that "Plaintiff's daughter, who had seen someone suffer a stroke before, thought Plaintiff was experiencing detox symptoms, not those of a stroke." *Id.* Defendants' arguments fail to vitiate the genuine issue of material fact demonstrated by Plaintiff. Plaintiff's daughter was only incarcerated for five days, from May 5, 2016, to May 9, 2016, and only saw her mother on four occasions during this time; the record shows that Plaintiff's stroke symptoms did not

emerge until May 18, 2016. (Docs. # 73-4 at 29-32; 73-5 at 63, 68; 73-6 at 53 and 73-9 at 47). Therefore, her observations are not relevant. Moreover, Plaintiff—though confused and limited at times in her ability to move, think, and speak—made the GCDC staff aware of her symptoms and actively sought help on numerous occasions prior to her hospitalization. *See, e.g.*, (Docs. # 73-8 at 27-28, 42; 73-9 at 48-59, 55-56, 61, 64, 153, 164; 73-12 at 56-58 and 73-20). Most important, Napier herself then observed Plaintiff exhibit bizarre behavior, as well as an inability to respond to questions, dress herself, or stand—spurring Napier to assure Deputy Jett that she would "make some calls" in response to Jett's concern that something needed to be done. (Doc. # 73-12 at 71-78).

Plaintiff has alleged facts which, taken in the light most favorable to her, show that Napier was deliberately indifferent to Plaintiff's serious medical needs in violation of Plaintiff's clearly-established, constitutionally-protected rights. *Darrah*, 865 F.3d at 369; *Jerauld*, 405 F. App'x at 980; *Clark-Murphy*, 439 F.3d at 290. Accordingly, Napier is not entitled to qualified immunity and summary judgment as to Plaintiff's individual-capacity § 1983 claim against Defendant Audra Napier is **denied**.

### b.    Tammy Bullock

Deputy Tammy Bullock was assigned to the female x-block at GCDC and supervised Plaintiff while she was an inmate. (Doc. # 73-11 at 6-7, 15). As Plaintiff's symptoms progressed, Plaintiff told Deputy Bullock that she was not able to see, and inmates alerted Bullock to Plaintiff's complaints of "not full body movement." (Docs. # 73-11 at 15-17, 19-20 and 73-9 at 163). Bullock further observed Plaintiff have difficulty walking and dragging one of her legs behind her. (Doc. # 73-11 at 19-20).

On May 19, 2016, Bullock alerted medical, and LPN Ross told Bullock to "keep a closer eye" on Plaintiff and to call him if there were any changes. (Doc. # 73-2 at 77). However, there is evidence that Bullock did not keep a close eye on Plaintiff as Ross instructed. Bullock placed Plaintiff in an isolation cell, which she testified was meant to prevent other inmates from injuring themselves while lifting Plaintiff from the floor and assisting her to and from the bathroom. (Docs. # 73-2 at 76-77; 73-11 at 31 and 73-16). There is evidence that Bullock had to physically carry Plaintiff to the isolation cell—where Plaintiff would be alone with no one to assist her to and from the cell bathroom. (Docs. # 73-9 at 164 and 73-11 at 29-30, 50). While Bullock testified that she then placed Plaintiff on medical watch—which would have increased the number of times someone looked in on Plaintiff—Bullock admits that the record shows no evidence Plaintiff was actually placed on medical watch until May 20, 2016, after Bullock's shift ended. (Docs. # 73-7 at 56, 60 and 73-11 at 27-28, 30, 33).

Under these facts, there is sufficient evidence from which a reasonable jury could conclude that, by confining Plaintiff to an isolation cell without putting a medical watch in place to keep a closer eye on Plaintiff, as she had been directed by medical to do, Deputy Bullock disregarded a known substantial risk to Plaintiff. *Jerauld*, 405 F. App'x at 978. Plaintiff has therefore alleged facts which, taken in the light most favorable to her, show that Bullock was deliberately indifferent to Plaintiff's serious medical needs in violation of Plaintiff's clearly-established, constitutionally-protected rights. *Darrah*, 865 F.3d at 369; *Jerauld*, 405 F. App'x at 980; *Clark-Murphy*, 439 F.3d at 290; *Jerauld*, 405 F. App'x at 980; *Blackmore*, 390 F.3d at 896. Accordingly, Bullock is not entitled to qualified immunity

and summary judgment as to Plaintiff's individual-capacity § 1983 claim against Defendant Tammy Bullock is **denied**.

### c.    *Christopher Hankins*

The County Defendants argue that Jailer Hankins is entitled to summary judgment in his individual capacity because he had no personal involvement in Plaintiff's treatment or supervision. (Doc. # 77 at 9). Acknowledging that § 1983 does not impose *respondeat superior* liability, Plaintiff argues that by providing no oversight to GCDC, Hankins implemented an unconstitutional policy and therefore liability is direct, not vicarious. (Doc. # 73 at 38-39) (citing *Taylor*, 69 F.3d at 81).

In *Taylor*, the Sixth Circuit found that a facility supervisor was not entitled to summary judgment because a reasonable jury could find him individually liable—despite having no personal involvement with the plaintiff—when he knew the risk of sexual assault was inherently greater at the facility where the plaintiff was to be transferred and chose to disregard that risk. *Taylor*, 69 F.3d at 84. The *Taylor* defendant argued that individual liability was improper because he delegated responsibility over transfers to his subordinates. *Id.* at 81. The Sixth Circuit rejected this argument and found that "a triable question exists about whether [the supervisor] properly discharged his duty." *Id.* The *Taylor* court noted that the supervisor was charged with abandoning the specific duties of his position—implementing a transfer procedure—and had "actual knowledge of a breakdown in the proper workings of the department." *Id.* It was not the conduct of his subordinates, but his own abandonment of his duties, that imposed liability; stated differently, "[a] jury could find on the facts that [the supervisor] personally had a job to do, and that he did not do it." *Id.*

Likewise, a district court rejected a sheriff's argument that an individual-capacity § 1983 claim against him should be dismissed because he had no personal contact with the plaintiff. *McCullum v. Tepe*, No. 1:08-cv-387, 2011 WL 13186318, at *8 (S.D. Ohio Mar. 28, 2011). In *McCullum*, a plaintiff who had a history of suicidal ideations committed suicide while incarcerated. *Id.* at *1. It was a custom at the facility that inmates with signs of mental illnesses were assessed and treated by a social worker who determined whether they would be allowed to see the facility psychiatrist, who was only on site one day per week and otherwise only available by phone. *Id.* at *4. The sheriff hired a physician to oversee all treatment at the facility; nonetheless, Plaintiff argued that the sheriff—as the official ultimately responsible for overseeing medical policies—was deliberately indifferent to the plaintiff's serious medical needs because he allowed "a custom and practice of delegating to a social worker the authority to deny mental health treatment and medication to inmates . . . without supervision, while acting beyond the scope of their practice." *Id.* at *7. The *McCullum* court agreed, finding that a jury could conclude the sheriff "was deliberately indifferent because he hired [the physician] to develop a competent reliable system of mental health care . . . [but] failed to monitor [the physician's] work to insure that mental health services were being developed, conducted, and audited in accordance with state policy." *Id.* at 8.

Here, as in *Taylor*, the record shows that Jailer Hankins had a job to do, and that he did not do it. *Taylor*, 69 F.3d at 81. Hankins's testimony regarding the DOJ monitoring and facility deficiencies provides evidence of "actual knowledge of a breakdown in the proper workings of the department" and therefore a triable question remains whether Hankins, like *Taylor*, abandoned or properly discharged his duty. *Taylor*, 69 F.3d at 81.

Hankins conceded that he held the final authority to adopt policy for the jail and to hire, fire, and discipline personnel. (Doc. # 73-7 at 18). Hankins personally hired SHP, with the specific intention of "trying to satisfy the Department of Justice in getting the medical records issue that they were concerned about, sick calls, and stuff like that corrected" as well as to comply with the Department of Justice monitoring and overall trying to get the inmates "better health care." *Id.* at 29:1-23; 33:4-8. This provides evidence that Jailer Hankins knew medical care was being provided in an unconstitutional manner; however, there is no evidence that, other than hiring SHP, Hankins took any action to see that GCDC was brought into compliance with the DOJ requirements—despite the fact that the County's contract with SHP provides that "the County is, and shall be, solely responsible for compliance with the DOJ directives." (Doc. # 73-24 at 2).

Additionally, just like the sheriff in *McCullum*, who allowed social workers to act as gatekeepers to mental-health treatment by a the facility psychiatrist, here there is ample evidence in the record that Jailer Hankins continued to allow LPNs—who were not qualified to diagnose patients—to act as gatekeepers to treatment by a physician. *McCullum*, 2011 WL 13186318, at *4. Moreover, as in *McCullum*, while Hankins hired SHP to provide health care at GCDC, he wholly failed to monitor SHP's work to ensure that its health care services were being provided in compliance with the DOJ Resolution. *Id.* at *8.

Defendants seek to distinguish the *Taylor* case relied upon by Plaintiff, arguing that, unlike the warden in *Taylor*, here there is no evidence "that Jailer Hankins was aware of or acquiesced in any offending conduct of his subordinates" as to Plaintiff's treatment. (Doc. 77 at 8) (citing Plaintiff's reliance on *Taylor*, 69 F.3d at 81, as "misplaced and

inapplicable"). Hankins seeks to evade the application of *Taylor* by artificially narrowing the scope of inquiry to Plaintiff's specific circumstances. However, the Sixth Circuit in *Taylor* explained that "the correct inquiry is whether [the supervisor] had knowledge about the substantial risk of serious harm to a particular class of persons." *Id.*

Viewing the facts in the light most favorable to Plaintiff, genuine disputes of material fact exist as to whether Jailer Hankins had knowledge about the substantial risk of serious harm to GCDC inmates in need of acute medical care. A triable question exists about whether Christopher Hankins properly discharged his duty or "was deliberately indifferent because he hired [SHP] to develop a competent reliable system of mental health care . . . [but] failed to monitor [SHP's] work to insure that . . . health services were being developed, conducted, and audited in accordance with state policy." *McCullum*, 2011 WL 13186318, at *8. Plaintiff has therefore alleged facts which, taken in the light most favorable to her, show that Hankins was deliberately indifferent to Plaintiff's serious medical needs in violation of Plaintiff's clearly-established, constitutionally-protected rights. Accordingly, Hankins is not entitled to qualified immunity and summary judgment as to Plaintiff's individual-capacity § 1983 claim against Defendant Christopher Hankins is **denied**.

### 5. *Qualified immunity does not bar Plaintiff's state-law claims.*

The County Defendants' fourth and final argument asserts that qualified immunity bars Plaintiff's state-law negligence claim against Defendants Audra Napier and Tammy

Bullock[10] as set forth in Count Four of Plaintiff's Complaint. Under Kentucky law,[11] state officials sued in their individual capacities "enjoy only qualified immunity, which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.2d 510, 522 (Ky. 2001). Upon an officer's *prima facie* showing that the negligent act in question was performed within the scope of his or her discretionary authority, the plaintiff must establish, by direct or circumstantial evidence, that the act "was not performed in good faith." *Id.* at 523. Such absence of good faith "can be predicated on a violation of a causally related constitutional, statutory, or other clearly established right which a person in a public employee's position presumptively would have known was afforded to a person in the plaintiff's position." *Rowan Cty. v. Sloas*, 201 S.W.3d 469, 476 (Ky. 2006) (citing *Yanero*, 65 S.W.3d at 523).

The supervision of inmates is generally a discretionary, rather than ministerial, function. *See id.* Even under the discretionary-act framework, however, qualified immunity does not bar Plaintiff's state-law negligence claim because there is evidence, viewed in the light most favorable to the Plaintiff, that these Defendants did not act in good faith. The Court has already noted that evidence which a person in the public employee's position presumptively would have known was afforded to a person in the defendant's position. For the reasons set forth in the Court's discussion of deliberate

---

[10] The County Defendants' Motion for Summary Judgment also argues that Grant County is entitled to governmental immunity as to Plaintiff's negligence claim. (Doc. # 62-1 at 14). However, Count Four of Plaintiff's Complaint did not name Grant County, and applies only to Defendants Audra Napier and Tammy Bullock. *See* (Doc. # 1 at 12). Plaintiff concedes in her Response that "Plaintiff has not brought any state law claims against the County." (Doc. # 73 at 44). Accordingly, the County Defendants' argument on this point is moot.

[11] In ruling on the application of immunity on Plaintiff's negligence claim, Kentucky substantive law applies. *See Shepherd v. Floyd Cty.*, 128 F. Supp.3d 976, 980 (E.D. Ky. 2015) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 80 (1938)).

indifference, *supra*, Plaintiff has pointed to sufficient evidence on the record to create a genuine issue of material fact as to Defendants' state of mind and whether they acted in violation of Plaintiff's constitutional right to adequate medical care, causing Plaintiff's injuries—and whether that right was clearly established. *Rowan*, 201 S.W.3d at 476. Accordingly, summary judgment as to Plaintiff's state-law negligence claim against Defendants Audra Napier and Tammy Bullock on the grounds of qualified immunity is **denied**.

### C.    SHP Defendants' Motion to Strike

The next matter before the Court is the SHP Defendants' Motion to Strike.  (Doc. # 79).  The SHP Defendants seek to strike portions of Plaintiff's Response (Doc. # 73) to the County Defendants' Motion for Summary Judgment (Doc. # 62), to the extent Plaintiff's arguments were predicated upon a finding of wrongdoing by the County Defendants—as opposed to the actions of the County Defendants.  (Doc. # 79 at 2).  In support of their Motion to Strike, the SHP Defendants argued that a finding of wrongdoing on the part of the SHP Defendants in the course of adjudicating the County Defendants' Motion for Summary Judgment would result in prejudice, as the deadline for the SHP Defendants to file their own dispositive motion had not elapsed at that time and because Plaintiff had not moved for summary judgment against the SHP Defendants.  *Id.*  The SHP Defendants subsequently filed their Motion for Summary Judgment on September 17, 2018.  (Doc. # 83).

Rule 12(f) of the Federal Rules of Civil Procedure permits a Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Such a "drastic remedy" is proper "only when required for

the purposes of justice . . . when the pleading to be stricken has no possible relation to the controversy." *United States v. Appalachian Reg'l Healthcare, Inc.*, 246 F. Supp.3d 1184, 1193 (E.D. Ky. 2017) (citations omitted); *see also Operating Engin'rs Local 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015) ("Motions to strike are viewed with disfavor and are not frequently granted.").

The SHP Defendants' central issue is the timing of Plaintiff's Response, rather than any inherently objectionable content. Plaintiff's Response contains no "redundant, immaterial, impertinent, or scandalous" argument; rather, Plaintiff's contentions regarding the conduct of the SHP Defendants go to the heart of her supervisory-liability claim against Grant County pursuant to 42 U.S.C. § 1983. In light of the SHP Defendants' full and fair opportunity to contest any § 1983 liability in their dispositive motion filings, along with their failure to set forth any authority demonstrating that Plaintiff's Response contained "any redundant, immaterial, impertinent, or scandalous" material, the Motion to Strike is **denied**.

### D. SHP Defendants' Motion for Summary Judgment

The final matter before the Court is the SHP Defendants' Motion for Summary Judgment.[12] (Doc. # 83). The SHP Defendants assert six central arguments in support of their Motion for Summary Judgment.[13] (Doc. # 83). First, they argue that qualified

---

[12]     This matter has been fully briefed and is ripe for review. (Docs. # 86 and 92). Additionally, on February 12, 2019, the SHP Defendants filed a Notice of Additional Authority, to which Plaintiff filed a responsive Supplemental Authority and Response on February 14, 2019. (Docs. # 98 and 99). The Court has considered the parties' additional authority in the adjudication of the SHP Defendants' Motion.

[13]     Three of Plaintiff's four causes of action involve the SHP Defendants. First, Plaintiff alleges a claim pursuant to 42 U.S.C. § 1983 against Defendants SHP, Debbie Preston, David Ross, and David Watkins (Count One). (Doc. # 1 at 11). Second, Plaintiff alleges a state-law medical-malpractice claim against Defendants Preston, Ross, and Watkins (Count Two). *Id.* Finally, Plaintiff alleges a state-law negligence claim against Defendant SHP (Count Three). *Id.* at 12. The SHP Defendants seek summary judgment on all three counts.

immunity bars each of Plaintiff's claims against Defendants David Watkins, RN, Debbie Preston, LPN, and David Ross, LPN (the nurse Defendants).  (Doc. # 83-1 at 9-15). Second, the SHP Defendants argue that the nurse Defendants are entitled to summary judgment as to Plaintiff's § 1983 claim (Count One), because Plaintiff has not provided evidence of "deliberate indifference."  *Id.* at 15-26.  Third, they argue that Defendants Watkins and Preston are entitled to summary judgment as to Plaintiff's state-law medical malpractice claim (Count Two) because Plaintiff cannot provide evidence of causation. *Id.* at 26-27.  Fourth, the SHP Defendants argue that they are entitled to summary judgment on all claims on the grounds that Plaintiff's expert, Dr. Lang, cannot establish causation because his opinion is improperly speculative.  (Doc. # 83-1 at 27-28).  Fifth, the SHP Defendants argue that SHP is entitled to summary judgment as to Plaintiff's § 1983 claim (Count One) and negligence claim (Count Three) against the corporation, because there is insufficient evidence that SHP policies caused the inappropriate or delayed treatment of inmates.  (Doc. # 83-1 at 31).  Lastly, the SHP Defendants argue that they are entitled to summary judgment as to Plaintiff's claim for punitive damages against them because there is insufficient evidence of the requisite mental state on the part of these Defendants.  Each argument will be addressed in turn.  For the reasons set forth below, the SHP Defendants' Motion is **granted in part** and **denied in part**.

### 1. Qualified immunity does not bar Plaintiff's claims because the nurse Defendants' duties were ministerial in nature.

The SHP Defendants first argue that LPN Debbie Preston, LPN David Ross, and RN David Watkins are entitled to summary judgment as to each of Plaintiff's claims

against them because qualified immunity shields them from suit.[14]  (Doc. # 83-1 at 9) (citing *Yanero*, 65 S.W.2d at 517).  The Court disagrees.  Because the duties of the SHP employees at issue were ministerial in nature, qualified immunity does not bar Plaintiff's claims.

Qualified official immunity does not apply when the defendants' actions at issue "amounted to 'ministerial' duties rather than discretionary duties." *Sours v. Big Sandy Reg'l Jail Auth.*, 593 F. App'x 478, 487 (6th Cir. 2014) (finding that immunity did not bar inmate's gross negligence claim against facility nurse).  Kentucky courts have consistently found that "[t]he administration of medical care is a ministerial function" and "compliance with the applicable standard of care does not involve a discretionary governmental function." *Id.* (citing *Gould v. O'Bannon*, 770 S.W.2d 220, 222 (Ky. 1989)).  *See also Osborne v. Aull*, No. 2010-CA-1073, 2012 WL 3538276, at *3 (Ky. Ct. App. Aug. 17, 2012) (affirming trial court's ruling that facility nurses were not entitled to immunity); *Smith v. Franklin Cty.*, 227 F. Supp.2d 667, 681-681 n.15 (E.D. Ky. 2002) (noting that the administration of medical care by nurse is a ministerial function).

Defendants seek to rely on *Jerauld ex rel. Robinson v. Kroger*, to characterize their acts as discretionary.  353 S.W.3d 636 (Ky. Ct. App. 2011) [hereinafter *Kroger*].  The *Kroger* plaintiff claimed that a medical staff member, deputy jailer, and psychologist were negligent following the detainee's suicide attempt and resultant brain injury.  *Id.* at 639. The Kentucky Court of Appeals, however, has distinguished the *Kroger* decision in similar

---

[14]     As a corporate entity, "qualified official immunity does not apply to SHP" itself; nor does governmental immunity.  *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 744-45, 750 (6th Cir. 2015) (explaining that qualified immunity protects individual public officials or employees while governmental immunity applies to government agencies and entities).  The SHP Defendants concede this point.  (Doc. # 92 at 2) (citing *Shadrick*, 805 F.3d at 749).

circumstances and characterized nurses' application of treatment protocol as ministerial. *See Osborne*, 2012 WL 3538276, at *6.

In *Osborne*, an inmate's leg was amputated following the nursing staff's failure to promptly assess his uncontrolled diabetes symptoms and contact a physician in compliance with facility protocol. *Id.* In contrast to *Kroger*, which involved the defendants' decisions regarding the inmate's appropriate level of supervision based on their observations of his possible suicide risk and the professional judgment of a psychologist, treatment of the *Osborne* plaintiff merely required "straightforward" application of "the nausea and vomiting protocol supposedly in force at the Daviess County jail [which] required the nurses to contact a physician if the inmate's symptoms persisted for more than 24 hours." *Compare Kroger*, 353 S.W.3d at 640, *with Osborne*, 2012 WL 3538276, at *6. Because the *Osborne* nurses' acts involved "straightforward" application of a treatment protocol, the Kentucky Court of Appeals concluded that they were properly characterized as ministerial. *Id.*

Seeking to narrow the application of *Osborne*, the nurse Defendants here argue that "[a] ministerial action is one that does not involve any use of personal judgment." (Doc. # 92 at 3) (citing *Yanero*, 65 S.W.3d 510). This is not an accurate statement of the law. The Kentucky courts have made clear that "[a]n act is not necessarily 'discretionary' just because the officer performing it has some discretion with respect to the means or method to be employed." *Sours*, 593 F. App'x 487 (citing *Yanero*, 65 S.W.3d at 522). While the protocol was "intended to guide the nursing staff in assessing and treating the inmates' medical complaints," the *Osborne* court explained that complying with protocol

is nonetheless straightforward and ministerial in nature.  *Osborne*, 2012 WL 3538276, at *1.

The acts of the nurses here are more akin to those in *Osborne* than in *Kroger*.  The central inquiry is not the nurses' supervision of Plaintiff within the facility or the professional judgment of a psychologist, but rather a straightforward inquiry into their alleged failure to follow the list of actions required by the SHP Treatment Guidelines.  The nurses in this case admit that they are not qualified to diagnose inmates.  Just as in *Osborne*, here the nurse Defendants were tasked with conducting an assessment, observing symptoms, and reporting to a more qualified medical provider pursuant to SHP's Treatment Guidelines.

Shawnee Thoman, the representative for SHP, testified that the SHP Treatment Guidelines deal specifically with stroke symptoms.  If a patient presents with sudden numbness or weakness in the face, arm, or leg, especially on one side of the body, then the nurse is required to perform a full assessment.  None of the nurses provided a full assessment as set forth in the guidelines, as none of the three nurses documented or testified that they asked Plaintiff to smile or to repeat a simple phrase while assessing her for a stroke.  However, even the partial evaluations uncovered some symptoms noted in the SHP Treatment Guidelines.  All three nurses were informed or observed that Plaintiff was experiencing sudden numbness or weakness in one of her legs.  RN Thoman testified that after a stroke assessment as set forth in the SHP Treatment Guidelines, if "one limb wasn't operating the same as they other, then, yes, they should call the doctor."  (Doc. # 73-10 at 50).  RN Thoman testified that she would have called the doctor in the nurse Defendants' positions.  *Id.* at 85, 88-92.  Moreover, there is evidence that the nurse

Defendants frequently failed to properly chart their assessments of Plaintiff in violation of SHP protocol. Further, while the SHP Treatment Guidelines require that upon observation of any of the stroke symptom signs, the nurse is to act fast and call 911 or EMS, the record shows that RN Watkins concluded that Plaintiff had stroke symptoms but failed to call 911 or EMS and sent Plaintiff back to her cell to wait for hours before finally being transported to the hospital.

Viewed in the light most favorable to Plaintiff, the record reflects a genuine issue of material fact as to whether the nurse Defendants failed to follow the straightforward steps of the SHP Treatment Guidelines. Because the nurse Defendants' compliance with the applicable standard of care involves a ministerial, rather than discretionary, function, qualified immunity does not apply. *Osborne*, 2012 WL 3538276, at *3. Accordingly, summary judgment as to each of Plaintiff's claims against Defendants Preston, Watkins, and Ross on the basis of qualified immunity is **denied**.

> ### 2. *Defendants Preston and Ross are entitled to summary judgment as to Plaintiff's § 1983 claim but a genuine issue of material fact remains whether Defendant Watkins was deliberately indifferent to Plaintiff's serious medical needs.*

The SHP Defendants next argue that Defendant nurses—Debbie Preston, LPN, David Ross, LPN, and David Watkins, RN—are entitled to summary judgment as to Plaintiff's § 1983 claim (Count One), because Plaintiff has not provided evidence of the requisite deliberate indifference. As set forth, *supra*, to demonstrate a violation of her Eighth Amendment right to medical care, Plaintiff must show that each of the SHP Defendants acted with "deliberate indifference" to her serious medical needs—satisfying both the subjective and objective components of the deliberate-indifference test. *Comstock*, 273 F.3d at 702. Because deliberate indifference requires a fact-intensive

inquiry, the Court will examine the actions of each individual nurse Defendant in turn.

### a.    *Debbie Preston*

Plaintiff's § 1983 claim fails as to Debbie Preston, LPN, because Plaintiff cannot meet the subjective prong of the deliberate-indifference test.   Preston saw Plaintiff on three occasions.  First, on May 18, 2016, Deputy Adams notified Preston that Plaintiff was reporting being unable to feel her leg.  Preston did not assess Plaintiff at that time.  On May 19, 2016, Plaintiff presented to Preston who noted that Plaintiff "continues to complain of having a stroke."  Preston did not review prior entries in Plaintiff's chart or review the SHP Treatment Guidelines for a stroke; instead, she conducted an assessment and concluded that Plaintiff's vitals were normal.  Preston observed that Plaintiff's hand grasp was equal and adequate, that Plaintiff could lift her arms equally, had feeling in her reflexes and feet, and appeared alert and oriented.  Preston then performed the Babinski test to check for neurological issues.  Preston incorrectly interpreted the results, misinterpreting Plaintiff's response as normal, when it was in fact abnormal.  Based upon this test and Plaintiff's vitals, Preston concluded that Plaintiff did not have neurological problems.  Finally, on May 20, 2016, Preston assessed Plaintiff again and noted that Plaintiff was still complaining that she could not feel her leg and that she fell.  Preston further noted that Plaintiff's right arm curled up at times.  Nonetheless, Preston cleared Plaintiff's condition.

Based upon these facts, there is a genuine issue of material fact as to whether LPN Preston acted negligently in her treatment of Plaintiff.   However, evidence of malpractice or negligence is insufficient under 42 U.S.C. § 1983.  *Estelle*, 429 U.S. at 105-06.  Even viewing the facts in the light most favorable to Plaintiff, there is not a

genuine dispute of material fact as to whether LPN Preston had the requisite subjective knowledge about the substantial risk of serious harm Plaintiff faced under the second prong of the deliberate-indifference test. The evidence shows that Preston incorrectly interpreted the results of the Babinski test and concluded—wrongly—that the results were normal. Without more, the evidence does not raise a genuine issue of material fact as to whether LPN Preston "subjectively perceived facts from which to infer substantial risk to the prisoner" and then "did in fact draw the inference." *Comstock*, 273 F.3d at 703. Accordingly, summary judgment is appropriate as to Plaintiff's § 1983 claim against Debbie Preston.

Plaintiff seeks to rely on *Taylor v. Franklin County* in support of her claim that Preston possessed the requisite subjective knowledge. 104 F. App'x 531 (6th Cir. 2004). However, the *Taylor* facts are distinguishable; in *Taylor*, the nurse merely "professed ignorance" of the plaintiff's immobility despite observing officers drag him to medical on a mattress as he lay motionless. *Id.* at 541. Here, Preston's state of mind is evidenced not just by her own testimony, but by external evidence that she unwittingly misapplied the Babinski test results. A plaintiff must show "more than negligence or the misdiagnosis of an ailment." *Winkler v. Madison Cty.*, 893 F.3d 877, 892 (6th Cir. 2018) (citing *Comstock*, 273 F.3d at 703).

In *Winkler*, a nurse concluded—wrongly and without eliciting sufficient information—that the prisoner was suffering from opiate withdrawal; nonetheless, the trial court found that summary judgment was proper because "[n]othing in the record . . . support[ed] a conclusion that [the nurse] consciously exposed [plaintiff] to such a risk" of serious harm. *Id. See also Harris v. Kilpatrick*, No. 5:05-cv-113, 2007 WL 80939, at *12

(W.D. Mich. Jan. 8, 2007) (finding no showing of deliberate indifference when the plaintiff complained he was having a stroke but the nurse concluded it was a case of the flu because "a misdiagnosis is evidence of negligence, not a constitutional claim.").

Here, just as in *Winkler*, while Preston may have concluded wrongly that Plaintiff was not suffering from an acute condition, nothing in the record supports a conclusion that Preston consciously exposed Plaintiff to a risk of serious harm. Plaintiff has therefore failed to point to evidence that, when taken in the light most favorable to her, demonstrates that Preston acted with deliberate indifference to Plaintiff's serious medical needs. Accordingly, summary judgment as to Plaintiff's § 1983 claim against Defendant Debbie Preston is **granted**.

### b.    *David Ross*

Plaintiff's § 1983 claim as to David Ross, LPN, likewise fails because Plaintiff cannot meet the subjective prong of the deliberate-indifference test. Ross saw Plaintiff on two occasions. On May 18, 2016, Deputy Bullock informed Ross that Plaintiff had been limping and complained that she could not feel her foot. Just as LPN Preston did, Ross conducted an evaluation of Plaintiff, found that her vital signs were normal, and performed and improperly interpreted a Babinski test for neurological issues. Ross determined that Plaintiff could bear weight on the numb leg and could move her toes. Further, he observed that Plaintiff did not have facial droop and had normal grip strength. There is no indication Plaintiff had trouble speaking or demonstrated bizarre behavior in front of Ross, nor that such symptoms were communicated to him. Noting from Plaintiff's intake form that she had back problems, Ross concluded that the numbness in Plaintiff's leg was sciatica. He put a note in the physician binder for the doctor to review. Ross told

Deputy Bullock to place Plaintiff on medical watch and to call the medical unit if there were any changes. On May 19, Ross assessed Plaintiff again. He observed Plaintiff limping while walking, but that did not change his assessment of sciatica as he found that Plaintiff's condition had not changed from the day before.

Just as with LPN Preston, here there is not a genuine issue of material fact as to LPN Ross's subjective knowledge of a serious risk. Ross concluded—wrongly—based upon his review of the intake form and his misinterpretation of the Babinski test that Plaintiff was experiencing sciatica. Ross's misdiagnosis is evidence of negligence, but it does not rise to a constitutional claim. *Harris*, 2007 WL 80939, at *12. While hindsight shows Ross should have acted sooner or taken different actions, nothing in the record supports a conclusion that Ross consciously exposed Plaintiff to a risk of serious harm.

Plaintiff argues that she was placed in an isolation cell but not put on medical watch; however, the evidence does not show that Ross was aware that Deputy Bullock ignored his instructions to keep an eye on Plaintiff. Likewise, Plaintiff's reliance on *Shadrick v. Hopkins County* is misplaced, as there is not evidence that Ross "actually drew the inference of a substantial risk of serious harm and recklessly disregarded it." 805 F.3d 724, 730 (6th Cir. 2015). Plaintiff has therefore failed to point to evidence that, when taken in the light most favorable to her, demonstrates that Ross acted with deliberate indifference to Plaintiff's serious medical needs. Accordingly, summary judgment as to Plaintiff's § 1983 claim against Defendant David Ross is **granted**.

### c.    *David Watkins*

Plaintiff can demonstrate facts from which a reasonable juror could infer that Defendant David Watkins, RN, acted with deliberate indifference to her serious medical

needs—satisfying both the subjective and objective components of the deliberate-indifference test. *Comstock*, 273 F.3d at 702. Watkins assessed Plaintiff on one occasion, when Corporal Napier transported Plaintiff from the shower at approximately 9:48 p.m. on May 20, 2016. Watkins, just like Ross and Preston, performed and improperly interpreted the Babinski test for neurological issues; however, Watkins was able to recognize that Plaintiff was displaying stroke symptoms. Specifically, RN Watkins observed that Plaintiff was having trouble speaking, could not raise her arms equally, and could not write her name accurately. Despite recognizing stroke symptoms, at 10:51 p.m. on May 20, 2016, Plaintiff was taken back to her isolation cell and placed on medical watch—in violation of the "act F.A.S.T." stroke protocol set forth in the SHP Treatment Guidelines. It was not until 1:47 a.m. on May 21, 2016—approximately three hours after Corporal Napier transported Plaintiff to the medical unit by wheelchair—that Plaintiff was taken to St. Elizabeth Grant County Hospital.

First, these facts satisfy the subjective component of the deliberate-indifference test, showing that Defendant Watkins "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703 (citing *Farmer*, 511 U.S. at 837). Unlike Defendants Ross and Preston, Watkins testified that he became aware that Plaintiff was exhibiting stroke symptoms despite his misinterpretation of the Babinski test. Furthermore, despite appreciating Plaintiff's risk, there is evidence that Watkins chose to return Plaintiff to her isolation cell for more "monitoring" rather than sending her promptly to a hospital, in violation of the SHP Treatment Guidelines. *See Terrance*, 286 F.3d at 844 ("[A] prison employee's two-hour delay in providing medical care to an inmate known

to have a serious condition may constitute deliberate indifference.") (internal citations omitted); *Dominguez*, 555 F.3d at 551 (finding the plaintiff demonstrated a disregard for her serious medical needs when nurse allowed him to return to a cell with no air conditioning despite knowledge of severity of the plaintiff's heat-stroke symptoms).

Next, turning to the objective prong of the deliberate-indifference test, the SHP Defendants argue that summary judgment is appropriate because Plaintiff has not produced verifying medical evidence establishing that Watkins' actions caused Plaintiff's injuries.  (Doc. # 83-1 at 17) (citing *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001)).  The SHP Defendants argue that Watkins did not assess Plaintiff until after the expiration of the stroke-treatment window established by Plaintiff's own expert, Dr. Lang, and therefore Plaintiff cannot show a detrimental effect from Watkins's three-hour delay in seeking treatment.  Plaintiff's expert, Dr. Lang, testified that Plaintiff's treatment window for being treated for her stroke with tissue plasminogen activator (tPA) closed on May 18, 2016.  (Doc. # 86-2 at 49-58).  Accordingly, because Watkins did not assess Plaintiff until May 20, 2016, the SHP Defendants argue that Plaintiff failed to establish causation against Watkins with respect to her stroke-related injuries.

Where a deliberate indifference claim is based upon a delay in treatment, in order to satisfy the objective component the plaintiff generally "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed."  *Napier*, 238 F.3d at 743.  However, as the SHP Defendants appear to concede, this requirement applies to claims regarding the *adequacy* of the delayed treatment.  *See* (Doc. # 83-1 at 23, 25-26) (citing *King v. Alexander*, 574 F. App'x 603, 605 (6th Cir. 2014); *Santiago v. Ringle*, 734 F.3d 585 (6th Cir. 2013) (requiring medical

proof when the plaintiff, rather than complaining he received no medical treatment, instead complained that he was delayed in receiving a specific type of medical treatment). For example, in *King*, medical staff provided the inmate with treatment for her severe burn, and the plaintiff's claim "stem[med] from the alleged inadequacy of her medical treatment in jail, not from a complete absence of medical care." *King*, 574 F. App'x at 606. As the Sixth Circuit explained in *King*, adequacy-of-care claims differ from inmates' claims that they received no care at all, and the latter does not require medical expert testimony regarding causation. *King*, 574 F. App'x at 606 (citing *Blackmore*, 390 F.3d at 899-900) (concluding that medical-expert testimony was not necessary to support a deliberate-indifference claim where Blackmore received no medical care within a reasonable timeframe).

In the instant action, Plaintiff's central claim is that "she received <u>no medical treatment</u> for her stroke symptoms in the Grant County Jail." (Doc. # 86 at 41). The nurse Defendants—particularly Watkins—assessed Plaintiff and sporadically ordered her to be placed on a medical watch, but provided no treatment, did not reach out to the on-call physician or nurse practitioner, and did not call EMS despite being required by the SHP Treatment Guidelines to "act F.A.S.T." when patients show signs of a stroke. The fact that Watkins eventually ordered Plaintiff to be transported to a hospital hours after assessing her does not transform Plaintiff's cause of action into an adequacy-of-care claim.

Moreover, medical proof is necessary only "to assess whether the denial of medical care caused a serious medical injury in cases where the prisoner or pretrial detainee's 'affliction is seemingly minor or non-obvious.'" *Estate of Owensby v. City of*

*Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005) (citing *Blackmore*, 390 F.3d at 899). Where, as here, Plaintiff's need for medical care when she presented to Watkins on May 20, 2016 was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention," medical proof is not required. *Id.* As the Sixth Circuit explained in *Blackmore*, "[t]his violation is not premised upon the 'detrimental effect' of the delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm." *Blackmore*, 390 F.3d at 899.

Here, Plaintiff's need for medical care was obvious by the time Watkins conducted his assessment. Watkins observed that Plaintiff was behaving bizarrely and was unable to speak, write her name, or raise her arms equally; furthermore, Watkins's review of Plaintiff's chart revealed that she had been suffering stroke symptoms since May 18, 2016. Plaintiff need not prove that Watkins's acts or omissions were the proximate cause of her injuries in order to satisfy the objective prong of the deliberate-indifference test. The effect of Watkins's delay "goes to the extent of the injury, not the existence of a serious medical condition." *Owensby*, 414 F.3d at 604. Plaintiff has therefore alleged facts which, taken in the light most favorable to her, show that Watkins was deliberately indifferent to Plaintiff's serious medical needs. Accordingly, summary judgment as to Plaintiff's § 1983 claim against Defendant David Watkins is **denied**.

### 3. *While Defendant Watkins is entitled to summary judgment as to Plaintiff's state-law medical malpractice claim, Defendant Preston is not.*

The SHP Defendants next argue that Defendants Watkins and Preston are entitled to summary judgment as to Plaintiff's state-law medical malpractice claim (Count Two), because "there is no medical proof linking any action or inaction by them to an injury to

the Plaintiff."[15]  (Doc. # 92 at 7).    Specifically, the SHP Defendants argue that Preston and Watkins did not assess Plaintiff until after the expiration of the stroke-treatment window established by Plaintiff's expert.  Dr. Lang testified that the cause of Plaintiff's injuries was LPN Ross's failure to send her to the hospital on May 18, 2016 at 9:27 p.m.  Defendants argue that, because LPN Preston and RN Watkins did not interact with Plaintiff until the window for Plaintiff to receive tPA had closed, Plaintiff cannot show causation.

To establish a prima facie claim for medical malpractice under Kentucky law, "a plaintiff must introduce evidence, in the form of expert testimony, demonstrating (1) the standard of care recognized by the medical community as applicable to the particular defendant, (2) that the defendant departed from that standard, and (3) that the defendant's departure was a proximate cause of the plaintiff's injuries."  *Heavrin v. Jones*, No. 02-CA-16-MR, 2003 WL 21673958, at *1 (Ky. Ct. App. July 18, 2003) (citing *Reams v. Stutler*, 742 S.W.2d 586 (Ky. 1982)).    Likewise, "[a] plaintiff bringing a medical negligence claim in Kentucky must establish three elements: breach, causation, and injury."  *Andrew v. Begley*, 203 S.W.3d 165, 170 (Ky. Ct. App. 2006).  Under either theory, "expert testimony is generally required to establish causation."  *Baylis v. Lourdes Hosp., Inc.*, 805 S.W.2d 122, 124 (Ky. 1991).

### a.    Debbie Preston

As to Defendant Preston, the SHP Defendants' argument fails to recognize that LPN Preston was first notified of Plaintiff's symptoms within the window of tPA efficacy.

---

[15]    Defendants do not argue that Defendant Ross is entitled to summary judgment on this basis, as Plaintiff's expert opined that LPN Ross's failure to transfer Plaintiff to the hospital on May 18, 2016 at 9:27 p.m. is the cause of Plaintiff's permanent injuries.  (Doc. # 86-2 at 49-58).

On May 18, 2016, at approximately 6:15 p.m., Deputy Adams informed LPN Preston that Plaintiff reported not being able to feel her leg. However, LPN Preston did not assess Plaintiff at that time. Dr. Lang's report opines that the SHP Defendants "deviated from applicable standards of care in recognizing and treating stroke like symptoms and transporting Ms. Kindoll to a hospital where she could receive appropriate treatment" and that such "deviation from the standard of care was a direct and proximate/substantial factor in causing her injuries as a result of her stroke." (Doc. # 83-9 at 13). Moreover, Dr. Lang's report opines that "[i]f Michelle Kindoll had been transferred to the hospital promptly after [David Ross's] examination on May 18 at [9:27 p.m.], it is more likely than not that she would have avoided the severe permanent injury she sustained as a result of the stroke." *Id.* at 14. Because LPN Preston failed to appreciate, during the applicable treatment window, that Plaintiff's inability to feel her leg was a stroke symptom, and Dr. Lang testified that such failure constituted a deviation from the standard of care that was "a direct and proximate/substantial factor" in causing Plaintiff's injuries, *id.* at 13, there remains a genuine issue of material fact as to the requisite causation. Accordingly, summary judgment as to Plaintiff's medical malpractice claim against Defendant Debbie Preston is **denied**.

### b. David Watkins

The SHP Defendants' argument is more applicable to RN Watkins, because he did not receive notice of Plaintiff's symptoms until the treatment window had closed. Dr. Lang testified that even after the treatment window closed, the standard of care still called for sending Plaintiff to the hospital as soon as possible. (Doc. # 86-2 at 56). However, Dr. Lang conceded that he does not know if administration of tPA outside of the treatment

window specifically would have prevented Plaintiff from suffering the neurological deficits she incurred as a result of her stroke. *Id.* Dr. Lang's report does not indicate any other treatment outside the window would have prevented Plaintiff's injuries. Plaintiff's expert evidence therefore falls short of the causation requirement under Kentucky law as to Defendant Watkins. While Plaintiff's claims against Defendants Ross and Preston survive, Watkins is entitled to summary judgment as to Plaintiff's state-law malpractice claim against him. Accordingly, summary judgment as to Plaintiff's medical malpractice claim against Defendant David Watkins is **granted**.

### 4. The SHP Defendants failed to demonstrate that the causation opinion of Plaintiff's expert Dr. Lang is speculative.

The SHP Defendants' next argument also focuses upon Dr. Lang's causation opinion. Defendants argue that Plaintiff cannot demonstrate the requisite element of causation because the opinion of Plaintiff's expert, Dr. Lang, is improperly speculative. (Doc. # 83-1 at 27-28). Defendants point to Dr. Lang's testimony that tPA treatment would not likely have "completely reverse[d]" Plaintiff's stroke symptoms, and there is no certainty as to what Plaintiff's response to tPA would have been. *See id.*

Defendants' argument mischaracterizes the level of probability an expert opinion is required to show under Kentucky law. "An expert medical witness is not required to use the magic words 'reasonable probability.'" *Sakler v. Anesthesiology Assocs., P.S.C.*, 50 S.W.3d 210, 213 n.3 (Ky. Ct. App. 2001). The Supreme Court of Kentucky has explained that "[w]hile evidence of causation must be in terms of probability rather than mere possibility, we have held that substance should prevail over form and that the total meaning, rather than a word-by-word construction, should be the focus of the inquiry." *Baylis*, 805 S.W.2d 122, 124 (Ky. 1991).

Plaintiff has presented expert testimony that it is more likely than not her permanent injuries would have been prevented or mitigated if she had been transferred to the hospital at 9:27 p.m. on May 18, 2016. Dr. Lang, a neurologist, testified that had Plaintiff been transferred to the hospital within this treatment window, "she would more likely than not have received tPA" treatment and that, "more likely than not, she would have been spared her deficits" caused by the stroke. (Doc. # 86-2 at 50-51, 67-69). *See also* (Doc. # 83-9 at 14). Viewing the evidence in the light most favorable to Plaintiff, Dr. Lang's opinion presents appropriate causation evidence. Accordingly, summary judgment on this basis is **denied**.

### 5. SHP is not entitled to summary judgment as to Plaintiff's § 1983 claim (Count One) and negligence claim (Count Three).

Next, the SHP Defendants argue that SHP is entitled to summary judgment as to both of Plaintiff's claims against it. (Doc. # 83-1 at 28-31). SHP contends that (1) there is no evidence that SHP consciously disregarded a known risk of harm to the Plaintiff; (2) Plaintiff failed to establish verifying medical evidence showing that SHP's conduct caused her harm; and (3) Plaintiff cannot demonstrate that SHP breached its duty to establish appropriate treatment policies at GCDC because the opinion of Plaintiff's correctional health care expert, Lawrence Mendel, DO, should be excluded under Rule 702 of the Federal Rules of Evidence.[16] *Id.* Each of these arguments fail.

SHP's argument that it is entitled to summary judgment as to Plaintiff's negligence claim because Plaintiff "has failed to establish verifying medical evidence of any harm to Plaintiff resulting from SHP's conduct" is unavailing. (Doc. # 83-1 at 28). Dr. Lang's

---

[16] The SHP Defendants seek to exclude Dr. Mendel in a subsequently-filed Motion, which the Court will address separately. *See* (Doc. # 82).

report opines that "[i]f Michelle Kindoll had been transferred to the hospital promptly after [David Ross's] examination on May 18 at [9:27 p.m.], it is more likely than not that she would have avoided the severe permanent injury she sustained as a result of the stroke." *Id.* at 14. However, Plaintiff was incorrectly diagnosed by LPN Ross with sciatica—a diagnosis Ross was unqualified to make. Viewing the evidence in the light most favorable to Plaintiff, a genuine issue of material fact exists as to whether the lack of any policies or procedures to rectify the risks identified by the DOJ investigation caused Plaintiff's injury.

SHP has also failed to show that it is entitled to summary judgment as to Plaintiff's § 1983 claim. The Court is unconvinced by SHP's argument that it is entitled to summary judgment because Plaintiff's correctional medical expert, Dr. Mendel, should be excluded. Even if Dr. Mendel's opinion were found to be inadmissible, Plaintiff has produced sufficient evidence that, when viewed in the light most favorable to her, supports Plaintiff's § 1983 claim against SHP.

SHP contends that it is entitled to summary judgment as to Plaintiff's § 1983 claim because Plaintiff cannot satisfy the subjective prong of the deliberate-intent test and show that "SHP 'consciously disregarded' a known risk of harm to the Plaintiff." (Doc. # 83-1). SHP's argument misapplies the appropriate standard. Plaintiff's § 1983 claim alleges, *inter alia*, that "[t]he rules, regulations, customs, policies and procedure of Grant County, the Grant County Jailer and SHP were inadequate and unreasonable and were the moving force behind the constitutional deprivations suffered by Michelle Kindoll." (Doc. # 1 at 11). Thus, Plaintiff's § 1983 claim against SHP requires application of the municipal-liability standard, not the two-prong deliberate-indifference test. *See, e.g., Horn*

*v. City of Covington*, 2018 WL 3865377, at *38 (E.D. Ky. Aug. 14, 2018) (citing *Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005)).

"It is well settled that private parties that perform fundamentally public functions, or who jointly participate with a state to engage in concerted activity, are regarded as acting 'under color of state law' for purposes of § 1983" and therefore face the same municipal liability as any other municipal entity. *Bartell v. Lohiser*, 215 F.3d 550, 556 (6th Cir. 2000). A private corporation such as SHP, therefore, "may be liable under § 1983 where the risks from its decision not to train its officers were 'so obvious' as to constitute deliberate indifference to the rights of its citizens." *Gray*, 399 F.3d at 617. A violation will occur when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [private corporation] can reasonably be said to have been deliberately indifferent to the need." *Miller v. Calhoun Cty.*, 408 F.3d 803, 816-17 (6th Cir. 2005) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)).

Likewise, as to the adoption of policies, "[e]ven if a municipality has not adopted an explicitly unconstitutional policy, the municipality may be liable for the failure to make a policy where one is needed." *Id.* (citing *Jones. v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986)). "It is not sufficient merely to show that a particular [employee] acted improperly or that better training would have enabled an [employee] to avoid the particular conduct causing injury." *Id.* at *38 (citing *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1059-70 (3d Cir. 1991)). The need for additional policies or procedures "to avoid deprivations of a constitutional right must be so apparent that any reasonable policymaker or supervisor would have taken appropriate preventive measures." *Id.* (citing *Jones*, 787

F.2d at 204.

Plaintiff has produced evidence that, along with Grant County, SHP was put on notice that the practice of having nursing staff act as gatekeepers to medical care placed inmates at risk—particularly in the case of acute medical conditions. SHP representatives met with Jailer Hankins and his subordinates to discuss bringing the facility into compliance to rectify the constitutional deficiencies in medical treatment identified in the DOJ investigation. Plaintiff was injured when an unqualified LPN misdiagnosed her acute condition and barred her from receiving care from a physician—the very risk that was identified and anticipated by the DOJ. Viewing the evidence in the light most favorable to Plaintiff, a genuine issue of material fact exists as to whether the lack of any policies or procedures to rectify the risks identified by the DOJ investigation would obviously lead to constitutional violations; likewise, a genuine issue of material fact exists as to whether the need for more or different training was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that SHP's policymakers can reasonably be said to have been deliberately indifferent to the need.

For the same reason, and as set forth, *supra*, Plaintiff's negligence claim against SHP survives. Viewing the evidence in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether SHP breached its duty to establish appropriate policies and procedures concerning medical treatment at GCDC. Accordingly, summary judgment as to Plaintiff's § 1983 claim and negligence claim against Defendant SHP is **denied**.

### 6. Defendants Preston and Ross—but not SHP or Watkins—are entitled to summary judgment on punitive damages.

Sixth and finally, the SHP Defendants argue that they are entitled to summary judgment as to Plaintiff's claim for punitive damages against them because there is insufficient evidence of the requisite mental state on the part of these Defendants.  Under Kentucky law, "[a] plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice."  Ky. Rev. Stat. § 411.184(2).  Punitive damages may also be awarded where "gross negligence" is shown.  *Williams v. Wilson*, 972 S.W.2d 260, 262-65 (Ky. 1998).  Gross negligence involves a "wanton or reckless disregard for the safety of other persons."  *Kinney v. Butcher*, 131 S.W.3d 357, 359 (Ky. Ct. App. 2004).  A showing of gross negligence does not require "that the jury find the defendant to have acted with express malice; rather, it is possible that a certain course of conduct be so outrageous that malice can be implied from the facts of the situation."  *Id.*

The Sixth Circuit has indicated that a finding of deliberate indifference can justify an award of punitive damages, as "the two standards are 'consistent,' . . . and that much of the evidence bearing on one question bears on the other."  *Gibson v. Moskowitz*, 523 F.3d 657, 664 (6th Cir. 2008) (finding that "the trial court permissibly delegated the question of punitive damages to the jury.").  *See also Hill v. Marshall*, 962 F.2d 1209, 1217 (6th Cir. 1992) (stating that other courts of appeals "have held that the state of mind that meets the standard of deliberate indifference is sufficient to meet the standard for punitive damages" and finding that the conduct of the defendant in that case could support a verdict for punitive damages).  Defendant's assertion therefore "is a harder argument

to make now that [the Court has] concluded that [Plaintiff] presented sufficient evidence to support a finding of deliberate indifference" as to Defendant Watkins. *Id.*

As set forth *supra*, Plaintiff's deliberate-indifference claims as to Defendants Preston and Ross fail. While there is certainly evidence that Preston and Ross did not undertake appropriate actions in response to Plaintiff's condition, there is not clear and convincing evidence to raise a genuine issue of material fact as to whether Preston or Ross acted with the requisite "oppression, fraud, or malice." Ky. Rev. Stat. § 411.184(2). There is not clear and convincing evidence that either nurse disregarded Plaintiff's safety; accordingly, summary judgment as to Plaintiff's punitive damages claim against Defendants Debbie Preston and David Ross is **granted**.

On the other hand, viewing the facts in the light most favorable to Plaintiff, there is evidence that Defendant Watkins as well as SHP acted with the requisite mental state. As to Defendants Watkins and SHP, therefore, "the Court will determine whether a punitive damages instruction should be submitted to the jury after hearing all the evidence." *Finn v. Warren Cty*, 1:10-cv-16, 2013 WL 3786634, at *5 (W.D. Ky. July 18, 2013). Accordingly, summary judgment as to Plaintiff's punitive damages claim against Defendants SHP and David Watkins is **denied**.

## III.    CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

(1)    The County Defendants' Motion for Summary Judgment (Doc. # 62) is **granted in part** and **denied in part**. Specifically,

(a)    The County Defendants' Motion for Summary Judgment as to all claims against Defendants Dedi Adams, Jessica Helton, and Whitney Jett is **denied as**

**moot** in light of the Court's August 7, 2018 Order dismissing all claims against these Defendants without prejudice (Doc. # 75);

(b)    The County Defendants' Motion for Summary Judgment as to Plaintiff's claim under 42 U.S.C. § 1983 against Defendants Audra Napier, Tammy Bullock, Christopher Hankins, and John and Jane Doe, in their official capacities, is hereby **granted** as unopposed;

(c)    The County Defendants' Motion for Summary Judgment as to all remaining claims against John and Jane Doe is hereby **granted**;

(d)    The County Defendants' Motion for Summary Judgment as to Plaintiff's claim under 42 U.S.C. § 1983 against Grant County is hereby **denied**;

(e)    The County Defendants' Motion for Summary Judgment as to Plaintiff's claim under 42 U.S.C. § 1983 against Defendants Audra Napier, Tammy Bullock, and Christopher Hankins, in their individual capacities, is hereby **denied**; and

(f)    The County Defendants' Motion for Summary Judgment as to Plaintiff's negligence claim against Defendants Audra Napier and Tammy Bullock is hereby **denied**.

(2)    The SHP Defendants' Motion to Strike (Doc. # 79) is **denied**.

(3)    The SHP Defendants' Motion for Summary Judgment (Doc. # 83) is **granted in part** and **denied in part**.  Specifically,

(a)    The SHP Defendants' Motion for Summary Judgment as to Plaintiff's claim under 42 U.S.C. § 1983 against Defendant David Watkins is hereby **denied**;

(b)    The SHP Defendants' Motion for Summary Judgment as to Plaintiff's claim under 42 U.S.C. § 1983 against Defendants Debbie Preston and David Ross is

hereby **granted**;

   (c) The SHP Defendants' Motion for Summary Judgment as to Plaintiff's medical-malpractice claim against Defendant Debbie Preston is hereby **denied**;

   (d) The SHP Defendants' Motion for Summary Judgment as to Plaintiff's medical-malpractice claim against Defendant David Watkins is hereby **granted**;

   (e) The SHP Defendants' Motion for Summary Judgment as to Plaintiff's claim under 42 U.S.C. § 1983 against Defendant Southern Health Partners, Inc. is hereby **denied**;

   (f) The SHP Defendants' Motion for Summary Judgment as to Plaintiff's negligence claim against Defendant Southern Health Partners, Inc. is hereby **denied**;

   (g) The SHP Defendants' Motion for Summary Judgment as to Plaintiff's punitive-damages claim against Defendants Debbie Preston and David Ross is hereby **granted**; and

   (h) The SHP Defendants' Motion for Summary Judgment as to Plaintiff's punitive-damages claim against Defendants David Watkins and Southern Health Partners, Inc. is hereby **denied**.

  (4) Within **twenty (20) days** from the date of entry of this Memorandum Opinion and Order, the remaining parties—Defendants Grant County, Audra Napier, Tammy Bullock, Christopher Hankins, Southern Health Partners, Inc., David Watkins, Debbie Preston, and David Ross—**shall file a Joint Status Report**, setting forth available dates for a Final Pretrial Conference and Jury Trial, and whether they would be amenable to a court-facilitated settlement conference on the remaining claims.

This 28th day of March, 2019.



Signed By:
*David L. Bunning*
United States District Judge

L:\DATA\Opinions\Covington\2017\17-84 Kindoll MSJ MOO.docx